### FRITH *v.* LAWRENCE, ADMINISTRATOR OF MACTIER.

Where an offer to sell is made to a distant correspondent by letter, and he declines the offer, he cannot afterwards assent to it so as to make it a valid purchase without a subsequent assent of the other party also.

If he accepts the offer conditionally, the other party is not bound unless he consents to the condition.

*An offer to purchase was made by letter, and previous to the receipt of the letter by the other party, the party making the offer died insolvent. The party receiving the letter consented to sell on the terms proposed, and sent an answer to that effect, but without any knowledge on his part of the death of the purchaser. Held, that he was not bound by such acceptance of the offer, and that the title to the property was not changed.

To make a valid contract, it is not only necessary that the minds of the contracting parties should meet on the subject of the contract, but that fact must be communicated to each other.

H. MACTIER was a commission merchant in New York, and died about the 10th of April, 1823. The complainant is a resident at Jacmel, in the republic of Hayti. He filed his bill in this cause against the administrators of Mactier, claiming a certain shipment of brandy, a part of which had been sold by Mactier in his life time, and the residue by the defendants. He also claimed a specific lien upon the proceeds of the sales of the brandy, and the proceeds of a certain letter of credit given by H. Wylie, or certain bills of exchange drawn in pursuance thereof, to pay a balance

due to him from the estate of Mactier, which was insolvent. The answer of the defendants being put in issue by a replication, an order was entered by consent, referring it to a master to examine the witnesses, &c., and report whether in his opinion the complainant was the owner of any, and what part of the shipment of brandy at the time of the sale of any such part, (whether the sale was made by the intestate, or by his administrators;) and if so, whether as such owner he had a lien by virtue of such ownership, on the said brandy, or the proceeds thereof in the hands of the defendants; and also whether he was entitled as owner, or as having any special claim or lien on the proceeds of the letter of credit, or of the bills of exchange. And if he should be of opinion that the complainant was entitled as a special creditor, or had a specific lien, the master was further directed to state an account, and report the amount due to him as such special creditor, or as having liens on any of the said subject matters. In such case he was also directed to report the amount due to the complainant as a common creditor, if any thing was due him in that character, beyond the amount due him as a special creditor. And all further directions were reserved.

*A mass of evidence, principally documentary, was taken before the master, and he finally reported that in his opinion the complainant was not the owner of any part of the shipment of brandy at the time it was sold, and had no lien on any part thereof, or on the proceeds in the hands of the administrators. He also reported that the complainant had no special claim or lien on the proceeds of the letter of credit of H. Wylie, or of the bills of exchange, drawn in pursuance thereof. The complainant excepted to the master's report, and the cause was heard on those exceptions before the late Chancellor, but was not decided by him. One of the administrators having died, the cause was continued against the survivor, and again brought to a hearing on the exceptions to the report.

[*436]

1829.

Frith
v
Lawrence.

*J. Stevens & G. Griffin*, for complainant:—No sale was made of the brandy in question by Frith to Mactier. The contract never passed from an inchoate to a consummated state. Any lurking intention to sell the brandy can be of no moment. The testimony shows offers and negotiations only, not conclusion of minds. The acceptance of the first proposition of Frith, was deferred by Mactier, and made to depend upon a condition. The second offer contained in a letter to Mactier did not reach this country until after his death, and therefore could not be binding upon Frith. (*Anson* v. *Meyer*, 6 East, 614; Pow. on Con. 442. A party can always revoke an offer until he has received notice of its acceptance. (*McCulloch* v. *Eagle Ins. Co.*, 1 Hick. 278. *Adams* v. *Lindsell*, 1 Barnwell & Ald. 681.) Mactier should in a reasonable time have elected to accept the proposition of Frith. (Rob. on Frauds, 142; *Eliason* v. *Henshaw*, 4 Wheat. 225; *Cooke* v. *Oxley*, 3 D. & E. 653.) If a vendee becomes insolvent before he takes possession of the goods sold, the vendor will not be bound by the contract of sale. (*Gibson* v. *Bray*, 8 Taunt. 76; *Wallace* v. *Breeds*, 13 East, 522; *Ward* v. *Feltan*, 1 East, 508; *Haggerty* v. *Palmer*, 6 John. Ch. Rep. 437.) The lien of the vendor for the purchase-money is not lost, nor his right of stoppage *in transitu* gone, until the goods come into the actual possession of the

[*437]

*vendee. (*Litt* v. *Cowley*, 7 Taunt. 169; Whit. Law of Liens, 214; *Hanson* v. *Meyer*, 6 East, 614; Anthon. N. P. 165; Abbot on Ship. 364; Long on Sales, 185; *Northey & Lewis* v. *Field*, 2 Esp. Rep. 613, 614; *Palmer* v. *Hand*, 13 John. Rep. 434; *Vernon* v. *Hankey*, 2 T. R. 113; *Godfrey* v. *Furzo*, 3 P. Wms. 185; 5 T. R. 215, 230, 233–4; French Com. Code. Art. 576, p. 301.) The defendants in this case had no right, as administrators, to divest the complainant of his right of stoppage *in transitu*, their intestate having died insolvent before the arrival of the goods. Goods in the custom house are in the custody of the government for the benefit of the consignor or unpaid vendor, and the right

of stoppage *in transitu* continues. Courts lean in favor of liens. (*Green* v. *Farmer*, 4 Burr. 2221, per Ld. Mansfield; *Garson* v. *Green*, 1 John Ch. R. 308.) Even payment of part of the purchase-money, or a delivery of part of the goods will not take away the right of stoppage *in transitu* as to the goods not delivered. (*Hodgson* v. *Loy*, 7 T. R. 436.) In this case the defendants had not given the bond for the duties to entitle them to the possession of the brandy. (*Fiese* v. *Wray*, 3 East, 93 ; *Mason* v. *Lickbarrow*, 1 H. Bl. 357 ; *Howat* v. *Davis & Chalmers*, 5 Munf. Vir. R. 34 ; *Parks* v. *Hall*, 2 Pick. R. 212.) A partner has the same right of stoppage *in transitu* as a sole owner. (*Hughes* v. *Kearney*, 1 Schoale & Lefroy, 135 ; *Patten* v. *Thompson*, 5 Maule & Selw. 367.) If Mactier had a joint interest with the complainant in the brandy, the complainant, as the surviving partner, had the exclusive right to possession. The defendants are liable for the bills of exchange drawn by H. Wylie, in favor of Mactier.

*D. S. Jones* and *S. Boyd* for the defendants :—The complainant was never liable to the French house for the brandy. The brandy was not of the quality ordered, and Mactier assumed the transaction, such as it was. Frith might therefore have disclaimed it. He, by letter, desired Mactier to take the whole speculation to himself; and Mactier, in effect, assented. Frith's intention to accept Mactier's offers was clearly shown by his acts. When Mactier insured the *commissions on the 1st of March, he had not heard whether Frith had accepted his proposition; and he therefore at that time treated the brandy as joint property. The sale of the brandy to Mactier was complete. Mactier, if he had lived, would have been legally bound by his proposition after the receipt of Frith's letter of the 7th March. As to the bills of exchange, they were in fact owned by Mactier, and Frith was not responsible to him for their payment.

[*438]

THE CHANCELLOR:—The counsel for the complainant insist that he is entitled to relief in this suit as a common creditor, if he has no specific lien on the funds in the hands of the defendant. That question does not properly arise at this time. It was not made a ground of exception to the master's report; neither was he authorized to report the amount due to the complainant as a common creditor under the order of reference. He was only to report the balance due to him as a common creditor, if it was ascertained he had a specific lien as to part.

On a careful examination of the testimony and the correspondence produced before the master, I agree with him that the complainant had no specific lien upon the proceeds of the letter of credit of H. Wylie. That appears to have been a transaction between the complainant and U. Bergeron & Co. on the one hand, and between them and Mactier on the other. The protested bills had been remitted by U. Bergeron & Co. to Mactier on account. By an agreement between Frith and the drawers, he had become responsible to see them paid. But they did not belong to Mactier, and he had no claim upon Frith, in consequence of the agreement entered into before the civil tribunal at Jacmel. The complainant by that agreement was bound to see the protested bill, with all costs and charges thereon, discharged; and as U. Bergeron & Co. wanted the funds in the hands of Mactier to meet his advances, the complainant procured the letter of credit to enable Mactier to realise the amount; but the latter had not discharged his claim against U. Bergeron & Co. or agreed to look to Frith for payment. The administrators, therefore, had a perfect right to use the letter of credit to satisfy the amount due from that firm, and were not bound to *offset their claim against the debt due from the estate to Frith.

As to the overdrawing, it can be of no importance in this case, except so far as it may affect the question of costs. I think under the circumstances the legal claim to

that small balance must belong either to H. Wylie, U. Bergeron & Co., or the house in England on which the drafts were made. If the administrators were authorized to draw to that amount, the surplus was properly placed to the credit of U. Bergeron & Co., on whose account they received the authorization. If they drew beyond the authority contained in the letter of credit, Frith was not responsible to H. Wylie for the surplus. So far as respects the complainant, this overdrawing cannot be distinguished from the original bill transaction; and if Frith is liable for the whole amount to H. Wylie, he must look to U. Bergeron & Co. for his indemnity, as the administrators were only their agents in procuring payment of the protested bills, and have paid over the surplus to the principals.

The material and important question in this cause relates to the shipment of brandy, which I will now consider. On looking into the testimony on this subject, and the correspondence between Frith and Mactier, I am satisfied the complainant never was the sole owner. But if he did not make a valid sale of his interest in that adventure previous to the death of Mactier, he has a specific lien upon the proceeds of the fifty pipes which were afterwards sold by the administrators, and the proceeds of the notes received on the sale of the first 150 pipes, which had not been collected or negotiated previous to Mactier's death. I have no doubt the original transaction was substantially as stated in the answer of the administrators. The parties undertook an adventure in which they were to be equal sharers in profit and loss. A cargo of brandy was to be purchased in France on the credit of Frith, and consigned to Mactier at New York. On its arrival there, he was to sell it and remit the invoice cost in provisions consigned to Frith at Jacmel; from the sale of which the latter was to raise funds to furnish a shipment of coffee to his correspondent in France, to pay the original cost of the *brandy. Under this agreement, it would be immaterial whether Mactier charged a selling commission on the brandy or not. If he charged a

*1829.*

Frith
v.
Lawrence.

[*440]

commission, it would have been countervailed by a similar charge on the sale of the provisions by Frith in the West Indies; but neither could be entitled to a *del credere* commission, as the sales would be at the risk of both. In pursuance of this agreement, on the 5th of September, 1822, while the complainant was on a visit to New York, he gave an order on Firebrace, Davidson & Co., of Havre, for the shipment of 200 pipes of brandy, to be consigned to Mactier; but on his return to Hayti, he came to the conclusion to give up the adventure to Mactier, if the latter would consent to take it off his hands. Accordingly, on the 24th of December, he wrote to Mactier proposing that he should take the adventure solely to his own account, holding the value to cover the transaction to the complainant's account in New York. If this proposition had been directly and explicitly accepted by Mactier, there could be no doubt as to the proceeds of the 150 pipes sold before his death. But it might be necessary to examine the question so much discussed on the argument, as to the right of Frith to stop *in transitu* the fifty pipes which remained in the public store, and which had not come to Mactier's hands, and the liquidated duties on which had not been secured at the time of his death. Having arrived at the conclusion that Mactier did not, in his answer of the 17th of January, 1823, intend to accept of that offer, and that it was not afterwards binding on Frith, I do not consider it necessary to express any opinion on the question as to his specific lien on the proceeds of the fifty pipes only.

In Mactier's answer to the proposition of the 24th of December, he says the original adventure had from the first been a favorite speculation, and still promised a favorable result, and he was desirous it should go on in the way first proposed; but as Frith had expressed a wish that he should take the same on his own account, he should delay coming to any conclusion till he again heard from the complainant. If he had stopped there, the answer could only have admitted of one construction; but he adds: " The

prospect of a war between *France and Spain may defeat the object of this speculation, as far as relates to the shipment of provisions hence to Hayti to be invested in coffee to be sent to France in French vessels, in which case I will at once decide to take the adventure to my own account."

The defendants' counsel insist that this was a conditional acceptance of the offer of Frith; and as he did not dissent from it, both parties were bound by it as soon as it was ascertained there was such a prospect of war between France and Spain, as to render it unsafe to go on with the original adventure. [Whatever might have been the intention of Mactier, it was not such an acceptance of the offer of the 24th of December as to make that offer binding on Frith. And Mactier having declined to accept the adventure as proposed, he could not by any subsequent assent to the original offer made a valid contract for the purchase of the interest of Frith in the brandy. It is evident this conditional acceptance of the offer was never acted on, or assented to by Frith. For as late as the 28th of March, instead of assenting to a conditional sale, he again renews the original offer of the 24th of December, which was for an absolute sale.

Mactier did not consider himself the absolute or probable owner of the brandy on the first of March, or he would not have insured the commissions he expected to receive on the sale. On the 13th of March, when he considered war between France and Spain as inevitable, he says nothing more on the subject of taking the speculation to himself, but speaks of the brandy as a matter in which they were jointly concerned. He says the offices refuse to insure on French vessels, and he fears the delay in the shipment of the brandy will operate to the disadvantage of himself and Frith. It is true, the vessel arrived safe on the evening of that day, and soon after that he began to talk with his clerk, and consult with his friends as to the propriety

1829.

Frith
v.
Lawrence.

or expediency of taking the brandy to himself. But he did not make up his mind until twelve days after the arrival of the vessel; and after he had ascertained the value of the brandy by an actual sale of three-fourths of the shipment. Under these circumstances, can it be supposed if any disaster had happened to the vessel *which was not covered or fully guarded against by the policy effected in in France, or the brandy had come to a bad market, he would have considered himself bound by the indefinite and vague expressions contained in his letter of the 17th of January.

On the 7th of March Frith acknowledged the letter of the 17th of January, but said nothing about the brandy. This communication was received on the 7th of April, two or three days before Mactier's death. Another letter was written by Frith on the 28th of March, which was not received until long afterwards. In this he repeated the original offer contained in the letter of the 24th of December. As this letter never came to the knowledge of Mactier, and could not have reached this country until some time after his death, the master very correctly decided that Frith was not bound by the offer contained therein. But as Frith there states that he intended to have made the same offer in the letter of the 7th of March, which Mactier did receive, the Master considers it evidence of a mental assent to the conditional acceptance of the offer of the 24th of December; and that the letter of the 7th of March is to be taken as if it contained a renewal of the proposition of the 24th of December. If the mental assent of Frith was alone sufficient to close the bargain, so as to make it binding on both parties, without any expression of such assent, I should not consider the expression in the letter of the 28th of March as evidence of that mental assent, but the contrary; because the offer in those letters is not the same contract as that contained in the letter of the 17th of January, but materially different. The first is an absolute

sale, to take effect immediately ; the other is conditional, to take place on a contingency, leaving Frith responsible for one-half of all risks in the mean time.

The letter of the 28th of March is undoubtedly evidence that on the 7th of that month Frith wished to renew his offer to sell.   To make a valid contract it is not only necessary that the minds of the contracting parties should meet on the subject of the contract, but they must communicate that fact to each other, so that both parties may know that their minds do meet.   Why did the master decide that the letters of the *25th and 28th of March did not of themselves make a valid contract?   Both minds met on the same point on the 28th of March, when the letter of Frith was written, and the invoice price of the brandy was credited to him by Mactier.   But as the latter never heard of the letter, and the former never heard of the entry until after the death of Mactier, there was no contract made which was binding on either.   If the master had applied this same principle to the mental assent of Frith at the time he wrote the letter of the 7th of March, he would have found it equally fatal to the supposed bargain, founded on the offer intended to have been inserted therein.   As Mactier never knew such an offer was intended to have been made, it is the same as if the offer had been inserted, but the letter had never reached him.   He could not assent to an offer which he never heard of, and consequently there was no bargain.[1]

[*443]

Having arrived at the conclusion that Frith did not in fact sell his interest in the adventure to Mactier, as survivor he is entitled to the net proceeds of the brandy so far

[1] The decision of the Chancellor in this case is overruled in *Mactier* v. *Frith*, 6 Wen. 103.   There held, that the offer to sell made by letter was an offer standing open for acceptance, at the time it was accepted, and the contract was then consummated, though the knowledge of the concurrence of wills, when the acceptance was made, was not known to the party who wrote the letter, and though he died *before notice* of the acceptance, by answer to the letter was received, but after the time of acceptance.

as they can be traced and identified. He has a specific lien on the fifty pipes sold by the administrators, and on the proceeds of the notes given for the other 150 pipes which remained uncollected in the hands of Mactier at the time of his death; or on so much thereof as is necessary to satisfy the balance due him for disbursements on account of that adventure. The report must, therefore, be referred back to the master to be corrected accordingly. And the question of costs on these exceptions, and all other questions are to be reserved until the coming in of the master's amended report.