MACTIER's ADMINISTRATORS, *appellants*, and FRITH, *respondent*.

Where a joint owner of a cargo of brandy, ordered from France and supposed to be at sea, wrote from St. Domingo to his co-owner in New-York on the 24th *December*, proposing that the latter should take the adventure *solely to his own account;* who, on the 17th *January* in answer to the proposition, said he would *delay coming to a determination* until he again heard from the party making the offer; and the owner in St. Domingo, on the *seventh* day of *March*, acknowledged the receipt of the answer, saying he had *noted its contents*, and on the *twenty-eighth* day of *March* by another letter *confirmed the offer* made in December; and the owner in New-York, on the *twenty-fifth* day of *March* after the arrival of the brandy in port, wrote to the owner in St. Domingo, that he had decided to take the adventure to his own account, and had credited him with the invoice; *It was held* that the offer to sell remained open, and that its acceptance on the 25th March closed the bargain, notwithstanding that the letters of the 25th and 28th March did not reach the places of their direction until after the death of the party accepting, which happened on the 10th April.

The death of a purchaser, after a contract is closed, will not, *it seems*, prevent the delivery of the goods to his representatives.

From the moment when the minds of the contracting parties meet, signified by overt acts, the contract is obligatory; although a knowledge of such concurrence is not known at the time to both parties.

A bargain may be considered as closed when nothing mutual between the parties remains to be done to give to either a right to have it carried into effect.

*It seems,* that where a negotiation for the sale of merchandize between contracting parties residing at a distance from each other is conducted by letter, the legal presumption is that the will of the party making a proposition to sell, continues until his letter had reached the party to whom it is directed, and the latter shall have signified, or at the least had an opportunity to signify his acceptance of the proposition.

A willingness to contract by the party offering is presumed to continue for the *time limited*, and if that be not indicated by the offer, until it is expressly revoked or countervailed by a contrary presumption.

Whether an offer remains open for acceptance at a particular period, is a question of fact to be determined by the circumstances of the case.

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

When there is doubt as to the *continuance* of an offer of contract at the time of acceptance, the subsequent acts of the party making the offer may be resorted to as evidence of the fact.

The acceptance of a written offer of a contract of sale consummates the bargain, provided the offer is standing at the time of the acceptance.

Whatever amounts to the manifestation of a formed determination to accept an offer of a contract of sale, communicated or put in a proper way to be communicated to the party making the offer, is an acceptance which will close the bargain; the knowledge by the party making the offer of the assent of the other forms no ingredient of an acceptance.

When an engagement is made by a party to *decide* on the happening of a certain event to accept an offer of a contract of sale, the contract is not completed on the happening of the event until the decision be made.

Where an offer is made by one joint owner to another to sell his interest in a cargo of merchandize, and previous to the acceptance of the offer three fourths of the cargo is sold by the party to whom the offer is made, it cannot be objected by him that the thing to which the contract relates had not an actual or potential existence at the time of the contract.

APPEAL from chancery. At New-York, in the autumn of 1822, the respondent and Henry Mactier the intestate, agreed to embark in a commercial adventure, in which they were to be jointly and equally interested. Frith was to direct a shipment of 200 pipes of *brandy* from France to New-York, to be consigned to Mactier, who was to ship to the respondent at *Jacmel,* in St. Domingo, *provisions* to the amount of the invoice cost of the brandy, and the respondent was to place the shippers of the brandy in funds by shipments of *coffee* to France in French vessels, and the parties were to share equally in the result of the speculation all around. In pursuance of this arrangement, Frith on the 5th September, 1822, wrote Firebrace, Davidson & Co., a mercantile house at *Havre,* to ship 200 pipes of brandy to New-York to the consignment of Mactier. On the 24th *December,* Frith, who had returned to *Jacmel,* where he did business as a merchant, wrote a letter to Mactier on a variety of subjects, in which was contained a paragraph in these words : " I also have the pleasure of handing you copies of Messrs. Firebrace, Davidson & Co's letters regarding the brandy order. By-the-bye, as your brother before I left New-York, declined taking the interest I offered him in this speculation, and wishing to confine myself in business as much as possible, so as to bring my concerns to a certain focus, *I*

*would propose to you to take the adventure solely to your own account,* holding the value to cover the transaction to my account in New-York." On the 17th January, 1823, Mactier wrote to Frith, acknowledging the receipt of his letter of the 24th ult; thanks him for sending the copy of Firebrace, Davidson & Co's letter on the subject of the brandy order; says that he has received a letter from them, informing that the brandy would be shipped and leave *Bordeaux* about the first of December then past; and adds, "this has been from the first a favorite speculation with me, and am pleased to say it still promises a favorable result; but to render it complete, I am desirous the speculation should go forward in the way first proposed, thereby making it a *treble* operation; as you have, however, expressed a wish that I should take the adventuae to my own account, *I shall delay coming to any determination till I again hear from you.* The prospect of war between France and Spain may defeat the object of this speculation, as far as relates to the shipment of provisions hence to Hayti to be invested in coffee for France, *in which case I will at once decide to take the adventure to my own account.* Our London accounts, down to the fifth of December, speak confidently of a war between France and Spain, a measure which, if carried into effect, would operate to *your disadvantage.*" Also: "The next arrival from Europe will probably decide the question of peace or war, and I will lose no time in communicating the same to you;" and also, "let what will happen, I trust you will in no way be a sufferer." On the 7th *March,* 1823, Frith wrote Mactier, making no other allusion to the last letter of Mactier than the following: "I have received your esteemed favors of the 17th and 31st January, *and note their respective contents.*" On the *twelfth* day of March, 1823, the ship *La Claire* arrived at New-York, laden with the brandy in question, and was at the wharf on the morning of the *thirteenth* of March. A clerk of Mactier testified that he had a conversation with Mactier about the time the brandy arrived, perhaps the morning after, and Mactier then said *he should take it to himself.* A merchant of New-York also tes-

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

ALBANY,
Dec. 1830.

Maetier
v.
Frith.

tified that Mactier consulted with him on the subject of some
brandy which he expected to arrive; there was some offer
for his taking it *on his own account*, and he appeared inclin-
ed to take it.   From the state of things, he advised Mactier
to take it, and there was a letter drafted by Mactier upon the
subject, in which the merchant made some alterations.   The
letter stated that he, Mactier, should take the brandy to his
own account.   On the *seventeenth* of March, Mactier enter-
ed the brandy at the custom house *as owner*, and *not* as con-
signee, took the usual oath, and gave a bond for the duties.
On the *twenty second* day of March, he sold 150 pipes of the
brandy on the wharf to several commercial houses, and took
their notes for the price of the same.   The remaining fifty
pipes were put in the public store, and remained there *in
bond*, the liquidated duties not having been secured to be
paid by Mactier.   On the *twenty-fifth* day of March, Mac-
tier wrote a letter, directed to Frith at *Jacmel*, in which he
said, "I have now to advise the arrival of French ship *La
Claire* with the 200 pipes of brandy, and that in consequence
of the probability of war between France and Spain, and in
compliance with the wish expressed in your regarded favor
of the 24th December and my answer thereto of the 17th
January last, *I have decided to take this adventure to my own ac-
count.*   I therefore credit you with the amount of the in-
voice," amounting to $14,254 $\frac{57}{100}$.   To this letter was at-
tached a postscript, dated the *thirty-first* of March.   On the
*twenty-eighth* day of March, Frith wrote a letter to Mactier,
dated at Jacmel, in which, speaking of the brandy in ques-
tion, he says: "With regard to this adventure, *I would wish
to confirm*, if altogether satisfactory to you, *what I mentioned
to you some time ago, and which I omitted to repeat to you in
my previous letter, in reply to yours of the* 17th *January.*   I find
the more one does in this country, in the present state of
trade, the more one's affairs get shackled."   *Previous to the
arrival of these two last letters at their respective places of direc-
tion, Mactier was dead,* he having departed this life on the
10th April, 1823.   On the 21st *April*, Frith again wrote a
letter addressed to Mactier, in which he acknowledges the
receipt of his letter of the *twenty-fifth of March*, says he has

*noted its contents*, and requests Mactier to charter on his account a staunch first class vessel, and send out to *Jacmel* by her 400 barrels of flour, 150 barrels of pork, 150 barrels of beef, 100 barrels of mackerel, &c. &c. In the mean time, however, Mactier having died, *administration* of his goods, &c. was granted to A. N. Lawrence and another, who, in *May*, 1823, gave the requisite bonds to secure the duties on the 50 pipes of brandy which had not been bonded for by Mactier in his lifetime, except by the general bond on entering the goods at the custom house, and took the 50 pipes from the public store and sold them at public auction.

The respondent, unwilling to come in as a general creditor of Mactier and receive a *pro rata* distribution, on the 1st April, 1824, filed his bill in the court of chancery, alleging that the brandy was shipped from France *on his sole account*, and that Mactier was only *the consignee thereof.* The respondent, in his bill, admits that he proposed to Mactier to become the *purchaser* of the brandy, but avers that after the receipt of his letter of the 17th January, he considered him as having declined his proposal, and that no other offer was subsequently made by the respondent. He sets forth a letter written to him by Mactier on the *thirteenth* day of *March*, 1823, in which, speaking of the brandy ordered from France, he says: "I am looking daily for its arrival; it is to be regretted the order was not more promptly executed, as the delay, I fear, will operate to *our* disadvantage. We have London dates to the 30th January; war between France and Spain may now be considered inevitable; France has recalled her minister, and 100,000 Frenchman have been ordered to march into Spain." He alleges that the letter of Mactier to him of the 25th March was not received until several days *after the death of Mactier*, and that his letter to Mactier of the 21st April was written in ignorance of the death of Mactier, and that he did not intend thereby, and he conceives he did not finally consummate the sale as claimed. He avers that the promissory notes received by Mactier from the purchasers of the 150 pipes of brandy remained in Mactier's possession at the time of his death, not discounted or passed away, and that the same came into the possession of,

and were at maturity collected by the defendants; that the defendants, by wrongfully and collusively representing themselves as entitled to the 50 pipes of brandy remaining in the public store, obtained possession of and sold the same; and that on the 2d July, 1823, he, by his attorney, claimed of the defendants the part of the shipment or invoice of brandy which remained unsold at the decease of Mactier, and also demanded the proceeds of that part of the invoice sold by Mactier existing in notes or otherwise, and the proceeds of the part sold by the defendants. The bill concludes by praying an account of the sales of the brandy, and a decree directing the defendants to retain in their hands sufficient of the funds belonging to the estate of Mactier to pay and satisfy the respondent when his accounts shall be settled and adjudged upon by the court.

The defendants put in their answer, insisting that the brandy, on its arrival at the port of New-York, was the sole and exclusive property of Mactier, and that the portion thereof which came to their hands at his decease, and the *proceeds* of that part thereof which was sold by him in his lifetime, and which came to their hands, rightfully belonged to his estate, and was subject to be disposed of in a due course of administration. The defendants admit that they have in their hands $13,935, belonging to the estate of Mactier, after the payment of certain debts to the United States, and various other sums of money which they were directed to pay, have credit for the payment of, and are authorized to retain, by virtue of a decree of the court of chancery of the 14th June, 1823, in a cause wherein A. Mactier senior, in behalf of himself and the creditors of Henry Mactier, deceased, is complainant, and themselves defendants; and they contend that such decree is in full force, and that by virtue thereof they are bound to pay the above mentioned sum of money, and such as may come to their hands *pro rata*, or equally among all the creditors of Henry Mactier, pursuant to such decree.

By the answer it was admitted that the defendants had found among the papers of Henry Mactier *two invoices* of the 200 pipes of brandy, similar in all respects, except that one

states the shipment to have been made 'to the address and for the *account of Henry Mactier,*' and the other states it to have been made 'for the *account of the complainant* to the address of Henry Mactier.' The first of the invoices was used upon entering the brandy at the custom house. It also appeared in evidence that on the *first* day of *March*, 1823, Mactier effected an insurance on *commissions* arising on a consignment from Bordeaux to New-York, to the amount of $1500. In a petty cash book of Mactier's there is the following entry: '1823, March 17, John A. Frith's sales of brandy, paid entry at custom house, eighty cents." The clerk of Mactier, who made this entry, testified that the name of Frith prefixed to the entry in the petty cash book does not necessarily prove that the brandy was Frith's, but it shews that he at that time supposed the brandy to be Frith's; if it had then belonged to Mactier, or if Mactier had decided to take it, and any entry in the books had been made shewing that fact, he would have entered it, ' Sales of brandy, Dr. for entering, &c.' At the time of making the entry, he considered the fact of ownership contingent. Mactier afterwards directed the account to be opened in the books, charging the brandy to himself, the account to be "Sales of brandy." An entry was made in the day-book of the *twenty-eighth* day of *March*, crediting Frith with the invoice amount of the brandy. Entries, he said, are sometimes made several days after the transaction; then the entry refers back to the true date of the transaction, mentioning the time. The entry was made by the *thirty-first* day of March. He also testified that the letter of the *thirteenth* of March, mentioned in the complainant's bill, was copied on the night of that day, but he had no recollection when it left the office; it possibly might not have gone until the *La Claire* arrived.

On the 20th May, 1825, Chancellor *Sanford* made an order of reference to a master to examine witnesses, and to report whether, in his opinion, the complainant was the owner of any part, and what part of the shipment of brandy at the time of the sale of the same or of any part thereof, and if so, whether, as such owner, he had a *lien* by virtue of such ownership on the brandy, or the proceeds thereof, in the

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

hands of the defendants; and that if the master should be of opinion that he was entitled as a special creditor, or had a lien, that then he should take and state an account, and report the amount due the complainant as such special creditor, or having a lien. Under this order witnesses were examined, and a mass of documentary evidence produced before the master, who, on the 10th October, 1825, reported that the complainant was *not the owner* of the shipment of brandy, neither at the time of the sale of the part thereof made by Mactier in his lifetime, or of the other part thereof made by the defendants as his administrators since his death, and had no lien on the brandy, or on the proceeds thereof in the hands of the administrators. To this report the complainant excepted, and the cause was heard upon the exceptions before Chancellor *Walworth,* who, in March, 1829, allowed the exception to that part of the master's report above stated, (other exceptions to other parts of the report, which it has not been deemed essential to state, were disallowed,) and *decreed* that the report be referred back to the master to alter and correct the same, and to take and state an account, and report the amount due the complainant, on the principle that he, as *survivor,* is entitled to the net proceeds of the adventure of brandy so far as they can be traced and identified, and has a *specsfic lien* on the net proceeds of the 50 pipes of brandy sold by the administrators, and of the proceeds of the notes given for the 150 pipes which remained uncollected or not passed away at the time of Mactier's death, or on so much as is necessary to satisfy the balance due complainant for payment and disbursements on account of that adventure, after deducting from those proceeds the balance of the amount paid for duties and expenses, if any, over and above the amount of proceeds of the shipment of brandy which were received by Mactier in his lifetime. From this decree the defendants appealed. For the reasons of the chancellor for the decree pronounced by him, see 1 *Paige,* 434. The cause was argued here, by

*S. Boyd & S. A. Talcott,* for the appellants.

*S. Stevens & G. Griffin,* for the respondent.

The following opinions were delivered :

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

By Mr. Justice MARCY. The object of the bill filed in this case is to obtain from the administrators of Mactier the proceeds of the 50 pipes of brandy which came to their possession after his death, and the amount of such notes taken on the sale of the 150 pipes on the 22d of March, 1823, as were uncollected and undisposed of at the death of Mactier, or at least so much thereof as may be necessary to pay the balance due the respondent for disbursements on account of the adventure. The question on which the decision in this case, as I apprehend, mainly depends, relates to the alleged sale of the brandy to Mactier. There are many definitions of what constitutes a contract, but all of them are, of course, substantially alike. *Powell* states a contract to be a transaction in which each party comes under an obligation to the other, and each reciprocally acquires a right to what is promised by the other. *Powell on Cont. 4.* In testing the validity of contracts many things are to be considered. The contract that the appellant sets up in this case is alleged by the respondent to be deficient in several essential requisites. When that was done which, on the assumption of there being parties capable of contracting, was necessary, as the respondent contends, to complete it, Mactier was dead. If the contract was only in progress of execution, and there remained but a single act to be done to complete it, his death rendered the performance of that act impossible ; it suspended the proceedings at the very point where they were when it occurred.

The doctrine of relation was discussed on the argument, and its application urged on us. It was insisted that if nothing but a formal act was to be done, and it was done by the surviving party after the death of the other, and in ignorance of it, this act might be adjudged to relate to a period antecedent to the death of the party dying. If, as it was held in the court below, the bargain in this case could not be closed until Frith received Mactier's letter accepting his offer to sell, the receiving that letter, it was said, might be considered as having relation to the time when it was sent, upon the prin-

ciple that courts often resort to this doctrine of relation to prevent an injury resulting to a party from the act of God. Where an agent without competent authority makes a contract, a subsequent ratification by the principal relates back to the time when the agent acted. The ratification is equivalent to an original authority; it is considered in law as furnishing proof of an authority in the agent at the time he assumed to have it. If, however, he had disclosed his want of authority, but had settled the terms of the contract, in the belief that what he did would be ratified, the doctrine of relation would not apply; the bargain would take effect from the time of the ratification. The reason of the distinction which I apprehend to exist in the two cases is, that in the one acts are done which make a perfect contract, provided the actors had the authority they assumed to have, and the ratification of their acts by those from whom their power must have been derived, if they had it, is legal evidence that they did have it when they acted. In the other case, the fact being made known that there was not competent power in one of the actors, the very foundation, on which alone the presumption of authority can rest, is destroyed. A presumption will not be called in to supply an impossibility. In a contract of sale all agree that there must be two minds, at least, concurring at the moment of its completion; but this cannot be if there be but one contracting party in existence. There is also, as I conceive, a difference between acts essential to perfect an agreement and those which relate to the forms prescribed in certain instances as modes of proof. This difference is illustrated by those cases which were referred to on the argument concerning the enrolment of deeds. The enrolment is a formal act, but necessary to be done, to enable the party to prove the bargain and sale, but when it is done it relates to the time when the indenture was executed. It is as Lord Bacon calls it, but a perfective ceremony of the first deed of bargain and sale. *Regula*, 14. So where chancery decrees the execution of a parol contract, on the ground of part performance, the title certainly, as between the parties, vests from the time of the contract, and not from the performance of those acts that remove the bar

created by the statute of frauds. The doctrine of relation may be permitted to operate on these *formal acts,* but it cannot be used, as it is proposed to use it here, to supply a *party* to a contract who does not exist at the time when the act is done which fixes to it the seal of validity ; or, what is the same thing, it cannot carry back that act to a time when parties capable of contracting did in fact exist. This view of the subject is conformable to the civil law as well as the law of France. By these laws, the death of the party offering to sell, is held to be a revocation of the offer, and an acceptance subsequent to that event, is ineffectual to close the bargain. *Pothier Traite du Contrat de Vente,** p. 1, § 2, art. 3, no. 32. My conclusion, in regard to this objection to the alleged contract, is, that if any act was required to be done, even by Frith, to complete the sale when Mactier died, that act could not be subsequently performed.

I am now to consider whether there was a contract, before Mactier's death, which had the consent of the contracting parties so given and made known as to be binding on

---

* Pour que le consentement intervienne en ce cas (entre absens) il faut que la volenté de la partie qui a écrit à l'autre pour lui proposer le marché, ait persévéré jusqu'au temps auquel sa lettre sera parvenue à l'autre partie, et auquel l'autre partie aura déclaré qu'elle acceptait le marché. Cette volonté est présumée d'avoir persévéré tant qu'il ne parait rien de contraire; mais, si j'ai écrit à un marchand de Livourne une lettre, par laquelle je lui proposais de me vendre une certaine partie de marchandises, pour un certain prix, et qu' avant que ma lettre ait pu lui parvenir, je lui en aie écrit une seconde, par laquelle je lui marquais que je ne voulais plus cette emplette, ou qu' avant ce temps je sois mort, ou que j'aie perdu l'usage de la raison ; quoique ce marchand de Livourne, au reçu de ma lettre, ignorant, ou mon changement de volonté, ou ma mort, ou ma démence, ait fait réponse qu'il acceptait le marché proposé, neanmoins il ne sera intervenu entre nous aucun contrat de vente; car ma volonté n'ayant pas persévéré jusqu'au temps auquel ce marchand a reçu ma lettre, et accepté la proposition qu' elle contenait, il ne s' est pas recontré un consentement ou concours de nos volentés nécessaire pour former le contrat de vente. C'est l'avis de Barthole, et des autres docteurs cités par Bruneman, *ad. l.* 1, § 2, *ff, de contrat. empt.* qui ont rejeté avec raison l'avis contrarie de la Glose, *ad dictam legem.*

### TRANSLATION.

In order that this consent may take place where the contracting parties are in different places, it is necessary that the will of the party who has written to the other, proposing a sale, should continue until his letter has reach-

them. That a consent is necessary all agree, but what shall constitute it in a given case may admit of much diversity of opinion. The consent of the parties in a contract of sale, as explained by *Pothier*, consists in the concurrence of the will of the vendor to sell a particular thing to the purchaser for a specified price, with the will of the purchaser to buy the same thing for that price. *Pothier Traite du Contrat de Vente, p. 1, § 2, art. 3, no. 31.* *Delvincourt*, another eminent French writer on the civil code of France, says, that although it is impossible that there should be a contract without the consent of all parties, it is not indispensable that the wills of the parties should concur at the same instant, provided the will of the one that did not concur at first, is declared before the will of the other is revoked. *5 Cours de Code Civil, 93.* Although the will of the party making the offer may precede that of the party accepting, yet it must continue down to the time of the acceptance. Where parties are together chaffering about an article of merchandize, and one expresses a present willingness to accept of certain terms, that willingness is supposed to continue, unless it is revoked, to the close of their interview and negotiation on the

---

ed the other party and he has declared that he accepts the offer. This will is presumed to have continued, if nothing appears to the contrary. But if I have written to a merchant at Livourne a letter proposing to sell him a particular article for a specified price, and before my letter has been received by him, I write to him a second declining to make the contract, or if before that time (i. e. before my letter is received and the offer contained in it is accepted) I am dead or have lost the use of my reason, although the merchant at Livourne, ignorant of my change of will, death or loss of reason, should, on receiving my letter, accept the offer contained in it, there would be no contract of sale ; for, my will not having continued down to the time when this merchant had received my letter and accepted the proposition contained therein, there was not that concurrence or meeting of our minds required to make a contract of sale. This is the opinion of *Bartholus,* and of the other doctors of the civil law, quoted by *Bruneman, ad. l. 1, § 2, ff, de contrat. empt.* who have correctly rejected the contrary opinion of the commentary *ad dictam legem.*

   * Il est impossible de concevoir un contrat sans le consentement de toutes les parties. Mais il n'est pas nécessaire que les volontés des parties concurrent dans le même instant; pourvu que la volonté de celle qui n'est pas intervenue dans le principe soit déclarée avant que l'autre ait révoqué la sienne, la convention est valablement formée.

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

same subject, and if during this time the other party says he will take the article on the terms proposed, the bargain is thereby closed. *Pothier Traite du Contrat de Vente, p.* 1, § 2, *art.* 3, *no.* 31. What I mean by its being closed is, that nothing mutual between the parties remains to be done to give to either a right to have it carried into effect ; either can enforce it against the other, or recover damages for the nonfulfilment of it ; but if there be conditions expressed or implied to be performed by the purchaser, he cannot compel the delivery until they are performed. If the price is to be immediately paid or security given, he cannot have the property until payment made, or security given, or a tender thereof. *Touchstone,* 204, 5. *Noy's Max. chap.* 42. 2 *Blackstone's Comm.* 447.

Where the negotiation between the contracting parties residing at a distance from each other is conducted, as it usually is by letters, it is necessary, in order that their minds may meet, that the will of the party making the proposition to sell should continue until his letter shall have reached the other, and he shall have signified, or at least had an opportunity to signify his acceptance of the proposition. This, *Pothier* holds to be the legal presumption unless the contrary appears. His language is : *Cette volente est presumee tant qu'il ne parait rien de contrarie.* This doctrine, which presumes the continuance of a willingness to contract after it has been manifested by an offer, is not confined to the civil law and the codes of those nations which have constructed their systems with the materials drawn from that exhaustless *store-house* of jurisprudence : it is found in the common law ; indeed, it exists, of necessity, wherever the power to contract exists in parties separated from each other. The rule of the common law is, that wherever the existence of a particular subject matter or relation has been once proved, its continuance is presumed till proof be given to the contrary, or till a different presumption be afforded by the nature of the subject matter. 16 *East,* 55. 3 *Stark. Ev.* 1252. The case of *Adams* v. *Lindsell,* 1 *Barn. & Ald.* 681, proceeds upon and affirms the principle, that the willingness to contract thus manifested is presumed to continue for the time limited, and,

if that be not indicated by the offer, until it is expressly re-voked or countervailed by a contrary presumption. In that case it was said, " the defendants must be considered in law as making during every instant of time their letter was trav-elling the same identical offer to the plaintiffs ; and then the contract is complete by the acceptance of it by the latter." Against the authority of the case of *Adams* v. *Lindsell,* we have urged on us a decision of a court of the highest respect-ability in one of our sister states. The case of *McCullock* v. *The Eagle Insurance Co.* 1 *Pick.* 278, conflicts in principle, ac-cording to my views of it, with the case decided by the king's bench. I should have been pleased to see these tribunals harmonize upon a question of no small importance to the commercial world ; and I have therefore deliberately weigh-ed the ingenious attempts made to reconcile these decisions upon this point; but these attempts appear to me to have been unsuccessful. A refinement which would distinguish between a contract for insurance, and one for the sale of goods in relation to the assent of the parties, might relieve us from the embarrassment which the different principles of these decisions is calculated to produce ; but to apply such a distinction hereafter would doubtless involve courts in a still more distressing embarrassment. Distinctions, which are not founded on a difference in the nature of things, are not entitled to indulgence; they tend to make the science of law a collection of arbitrary rules appealing to facticious reasons for their support, consequently difficult to be acquir-ed, and often of uncertain application. The two cases re-ferred to, should have had applied to them the same rule of law, and we are required to say what that rule is in deciding the case now under consideration.

The principle of the decision of the king's bench is sim-ply that the acceptance of an offer made, through the medi-um of a letter, binds the bargain if the party making the of-fer has not revoked it, as he has a right to do before it is ac-cepted. The rule laid down by the supreme court of Mas-sachusetts regards the contract as incomplete until the party making the offer is notified of the acceptance, or until the time when he should have received it, the party accepting

having done what was incumbent on him to give notice. The chancellor in deciding this case gave his sanction to the latter rule : " To make a valid contract," he says, " it is not only necessary that the minds of the contracting parties should meet on the subject of the contract, but they must know that fact."* The decision of the court of Massachusetts makes knowledge by the party tendering the offer of the other's acceptance essential to the completion of the contract. If one party is not bound till he knows or might know, and therefore is presumed to know that the other has accepted, the accepting party on the same principle ought not to be bound till he knows the offering party has not recalled the offer before knowledge of the acceptance. The principle of that case would bring the matter to the point stated by the chancellor, viz. the parties must know that their minds meet on the subject of the contract. If a bargain can be completed between absent parties, it must be when one of

---

* This proposition, which is an extract from the chancellor's opinion as printed in the *case* presented to this court, is somewhat modified in its terms, as it appears in the reports of the court of chancery. There it is said, " To make a valid contract, it is not only necessary that the minds of the contracting parties should meet on the subject of the contract, but they must communicate that fact to each other, so that both parties may know that their minds do meet." 1 *Paige*, 442. It is understood that the chancellor has said that his views on this subject have been mistaken or misapprehended. Though the general proposition above quoted is advanced in his opinion, it is introduced in that part of it where he is considering the effect of Mactier's letter of the 25th, and Frith's of the 28th of March, and what Frith intended to insert in his letter of the 7th of March. Having considered the offer of Frith, made in his letter of the 24th December disposed of by Mactier in his answer of the 17th January, declining to accept it, he then looks at the letters of the 25th and 28th of March to see if a contract was concluded by them ; and as Mactier died before his letter of the 25th reached Frith, and before Frith's letter of the 28th renewing the offer reached New-York, he considers those letters did not of themselves make a valid contract. The remark of the chancellor which has been taken for a general proposition of law is understood to have been made with a direct reference to the facts presented by these two letters. Taking this view of the chancellor's observation, the principal point of difference between him and the court for the correction of errors would seem to be, that he considered Mactier's letter of the 17th January as declining the offer, and therefore putting an end to it ; and the court considered that Mactier's answer held the offer under advisement, that it was so held down to the time when M. accepted it, and that Frith assented to its being thus held under advisement.

them cannot know the fact whether it be or be not completed. It cannot begin to be obligatory on the one before it is on the other; there must be a precise time when the obligation attaches to both, and this time must happen when one of the parties cannot know that the obligation has attached to him; the obligation does not therefore arise from a knowledge of the present concurrence of the wills of the contracting parties. All the authorities state a contract or an agreement (which is the same thing) to be *aggregatio mentium*. Why should not this *meeting of the minds*, which makes the contract, also indicate the moment when it becomes obligatory? I might rather ask, is it not and must it not be the moment when it does become obligatory? If the party making the offer is not bound until he knows of this meeting of minds, for the same reason the party accepting the offer ought not to be bound when his acceptance is received, because he does not know of the meeting of the minds, for the offer may have been withdrawn before his acceptance was received. If more than a concurrence of minds upon a distinct proposition is required to make an obligatory contract, the definition of what constitutes a contract is not correct. Instead of being the meeting of the minds of the contracting parties, it should be a knowledge of this meeting. It was said on the argument that if concurrence of minds alone would make a valid contract, one might be constructed out of mere volitions and uncommunicated wishes; I think such a result would not follow. The law does not regard bare volitions and pure mental abstractions. When it speaks of the operations of the mind, it means such as have been made manifest by overt acts; when it speaks of the meeting of minds, it refers to such a meeting as has been made known by proper acts, and when thus made known it is effective, although the parties who may claim the benefit of, or be bound by a contract thus made, may for a season remain ignorant of its being made.

Testing the rules of law laid down in the two cases to which I have referred by the authority of reason, and the practical results that are likely to flow from them, it does appear to me, that we are not left at liberty to hesitate about

the choice. If we are inclined from the force of abstract reason, to prefer the rule laid down by the court of king's bench, that inclination will be greatly strengthened by a recurrence to the opinions of courts and jurists. The common pleas in England seems to me to have given their approval to the decision of *Adams* v. *Lindsell,* 4 *Bing.* 653. Judge *Washington,* in delivering the opinion of the court, in *Gleason* v. *Henshaw,* 4 *Wheaton,* 228, said, "until the terms of the agreement have received the assent of both parties the negotiation is open, and imposes no obligation on either." The inference from this proposition is, that the assent of the parties to the terms of the agreement, and not their knowledge of it, completes the contract. It was decided in the circuit court of the United States, for *Pennsylvania,* that contracts are formed by the offer on the one hand, and an acceptance on the other. After acceptance, the contract is obligatory on both. *Coxe's Dig.* 192. In this case, knowledge of the acceptance is not brought into view as necessary to constitute the obligation. Both the Roman law and the French civil code, as we have seen by the references already made, contain a doctrine in accordance with the principle of these cases. I think I am therefore warranted in saying that the proposition may be considered as established, that the acceptance of a written offer of a contract of sale consummates the bargain, provided the offer is standing at the time of the acceptance.

What shall constitute an acceptance will depend, in a great measure, upon circumstances. The mere determination of the mind, unacted on, can never be an acceptance. Where the offer is by letter, the usual mode of acceptance is the sending of a letter announcing a consent to accept; where it is made by a messenger, a determination to accept, returned through him or sent by another, would seem to be all the law requires, if the contract may be consummated without writing. There are other modes which are equally conclusive upon the parties: keeping silence, under certain circumstances, is an assent to a proposition ; any thing that shall amount to a manifestation of a formed determination to accept, communicated or put in the proper way

to be communicated to the party making the offer, would doubtless complete the contract; but a letter written would not be an acceptance, so long as it remained in the possession or under the control of the writer. An acceptance is the distinct act of one party to the contract as much as the offer is of the other; the knowledge by the party making the offer, of the determination of the party receiving it, is not an ingredient of an acceptance. It is not compounded of an assent by one party to the terms offered, and a knowledge of that assent by the other.

I will now apply this law to the facts of this case. Frith's offer to sell his interest in the brandy certainly continued till his letter of the 24th of December was received at New-York and Mactier had a fair opportunity to answer it. If the answer of the 17th of January had contained an unqualified acceptance, the bargain would have been closed when it was sent away for Jacmel; but the offer was not then accepted; there was a promise to accept upon a contingency, for Mactier says, after alluding to the prospect of a war between France and Spain, "in which case," that is, in case of such a war, "I will at once decide to take the adventure to my own account." This concluded nothing. If the event had actually happened, and Frith had insisted on enforcing this conditional acceptance, it would not have been in his power to do so. The most that Mactier said was, that if an expected event happened, he would do an act which would complete the bargain. The happening of the event could not, without the act, complete it. The Roman law regarded the tense of the verb used by the contracting parties to determine whether the bargain was concluded: *Verbum imperfecti temporis rem adhuc imperfectam significat.* There is a wide difference between a promise to give an assent to a proposition for a contract on the happening of a contingency, and the annunciation of a present assent to it. If the expected event happens, and the act promised is performed, the bargain is closed; but it is the promised acceptance, and not the happening of the event, that gives validity to the contract. If in this case the offer of Frith had been to Mactier to take the brandy on the happening of a French and Spanish war, and

Mactier had promised to decide to take it in such an event, the simple fact of his taking it after the war would have enabled Frith to treat him as the purchaser of it. Such an act would have been a valid acceptance; but a conditional acceptance of an unconditional offer, followed up by acts of the acceptor after the condition was fulfilled on which the acceptance depended, might not be considered as completing the bargain without the acquiescence of the party making the offer in those acts, because the minds of the parties would not have met on the precise terms of the contract.

To conclude the bargain, Mactier must have accepted the offer as tendered to him by Frith, and that acceptance must have been while the offer, in contemplation of law, was still held out to him. That there was an acceptance, or rather that Mactier did all that was incumbent on him to do, to effect an acceptance, was not denied; but it was insisted, on the part of the respondent, that it was made after the offer was withdrawn. It will be necessary to consider when this acceptance took place, as preparatory to settling the fact of the continuance of the offer down to that time. There is not the slightest evidence of the determination on the part of Mactier to take the brandy before the 17th day of March. The insurance that he effected on his commissions on the 1st of March disproves the existence of such a determination on that day; but if the situation of the parties was changed, and Frith was now endeavoring to set up the contract, I am at a loss to conceive how Mactier's representatives could withstand the force of the facts which took place on the 17th of March. In answer to the offer, Mactier delayed coming to a determination thereon, but promised to accept it if there should be a war; on the 17th of March, when that event was considered as settled, he entered the brandy as his own property, and told his clerk that he had determined to take it. But if there should be any doubt as to the effect of this conduct, there can be none as to his subsequent acts. By a letter dated the 25th, with a postscript of the 31st of March, he accepted the offer. This letter was immediately transmitted to Frith, and as soon as the 28th of March, entries were made in his books shewing that he had

become the purchaser. Enough was done by the 31st to constitute an acceptance of Frith's offer and to complete the bargain, if the offer can be considered as standing till that day.

An offer, when once made, continues, as I have heretofore shewn, to the satisfaction of my own mind at least, until it is expressly revoked, or until circumstances authorize a presumption that it is revoked. The offer itself may shew very clearly when the presumption of revocation attaches. Where it is made to be replied to by return mail, the party to whom it is addressed must at once perceive that it is not to stand for an acceptance, to be transmitted after that mail. If an offer stands until it is expressly withdrawn, or is presumed to be withdrawn, whether it is held out to a party at a particular period or not, is a matter of fact. Then we are to determine, as a matter of fact, whether Frith's offer was held out for Mactier's acceptance until the 31st of March; if Frith intended it should stand on, and he viewed himself as tendering it to Mactier down to that time, we are bound to regard it as standing, unless his intention was the result of the fraudulent conduct of Mactier. The acts of Frith, after the death of Mactier, could do nothing towards completing an unfinished contract; but I think they may be fairly adverted to for the purpose of ascertaining his intentions in relation to the continuance of his offer. On the 7th of March he acknowledges Mactier's letter of the 17th January, which did not decline, as it has been construed to do, the offer, but apprized him that it was kept under advisement; and by using the expression, "*noting the contents*," Frith is, I think, to be understood as yielding to the proposed delay. If a doubt as to this construction of that letter could spring up in the mind, it would be at once removed by the perusal of the letter of the 28th of the same month. In that he expresses a wish to *confirm* what he had said in the letter making the offer to sell, and declares that he had in a previous letter, which must mean that of the 7th, omitted to communicate the same thing. In answering Mactier's letter which contained the acceptance of his offer, he recognizes the bargain as closed, and gives directions as to investing the proceeds of the brandy. All the subsequent correspondence acquiesces in the

sale. It appears to me to be impossible to say, after reading the letters of Frith written subsequent to his knowledge of Mactier's acceptance, that he did not consider the offer as held out to Mactier down to the time when it was accepted, and the bargain closed by that acceptance ; and I think we must adjudge it to have been closed, unless the agreement was nugatory by reason that the thing to which it related had not an actual or potential existence when the contract was consummated.

Where both parties are under a mistake as to the existence of the thing contracted to be sold, the bargain fails. The cases put by *Pothier* and Chancellor *Kent* are, the sale of a horse which happens to be dead, or of a house consumed by fire before the contract was concluded. The law which has been applied to such cases is not, in my judgment, applicable to this. Property that has no actual existence is the subject of a valid contract of sale, as a carriage not yet made, or a crop not grown ; they are considered to have a potential existence. A person may sell an article to which he has no title or pretence of title. *Pothier Traite du Contrat de Vente, p.* 1, § 2, *art.* 1. There is, I apprehend, no just ground for saying that the principal part of this brandy was not in existence on the 31st of March, the time when I consider the contract to have become perfected. Fifty pipes were in the public store ; the remainder had been sold but a few days before, and was probably but partially consumed ; but whether it was or not is not, in my view of it, material to this case. If the contract was obligatory on one, it was on both. Could Mactier have objected to it, and placed its nullity on the ground that he had consumed a part of the brandy before he accepted the offer for the purchase ? Such a defence would not be listened to in any court ; it could invoke no principle of justice to its aid.

Another objection to the contract was drawn from the alleged fraudulent conduct of Mactier. The bill does not seem to me to put the claim to the interference of the court below specifically upon that ground. It does not seek to avoid the contract on the ground that Frith was inveigled into it by the contrivance and artifice of Mactier, but it denies the exis-

tence of those formalities which are requisite to conclude a contract. Frith complains, it is true, that Mactier did not, by his letter of the 25th of March or any other, inform him of the sale of the brandy, of its value in New-York, or of the arrival of the vessel with the brandy on board. The letter of the 25th did apprize him that the brandy had arrived. If any act was to be done by Frith to complete the bargain, the concealment of any fact that might influence his determination with regard to that act, might give rise to the imputation of fraud ; and if such fact was concealed with a view to procure an assent to a contract to which it is probable his assent would not have been given had he received information of the fact concealed, he might allege the concealment to exonerate himself from the obligation to fulfil it ; but if he had no affirmative act to perform before the bargain might be closed, and Mactier was in a situation that gave him the right to close it, and he did so before the information which is alleged to have been kept back could have reached Frith, if it had been duly transmitted, he has suffered no injury ; indeed there is no ground for a presumption of fraud. My conclusion therefore is, that the contract was consummated between the parties before the death of Mactier, by which he acquired all Frith's right to the two hundred pipes of brandy.

The law in relation to the right of the vendor of goods to stop them during their transit to the purchaser, was much discussed on the argument ; but I have been unable to discover how a question, in relation to such a right, can properly arise from the facts in this case. If there was not a sale, such a question certainly cannot arise, for then there would be no vendor or vendee, and consequently no transit of the the brandy from the one to the other. If there was a sale, (and I hold there was,) the question does not arise, because there was in fact no stoppage or any act that can in law be regarded as amounting to a stoppage. By virtue of the purchase the title to the brandy vested in Mactier ; no actual delivery, if it was not in his possession, was necessary to perfect his title ; if the brandy had been destroyed on the first day of April, or the notes taken for the portion previously sold had proved utterly valueless, the loss would have fallen entirely on Mac-

tier. The unsold brandy was his absolute property, and on his death the title to it vested in his representatives. On the assumption that it was on its transit, the right of the representatives to it was subject to be affected in the same manner as Mactier's might have been if he had been in life ; it might have been defeated by a stoppage *in transitu.* A right to stop goods in their transit does not arise from the circumstance that the bargain is not complete until the purchaser gets actual possession of them, but it is a right taking its origin undoubtedly in strong considerations of equity, and dependent upon a fact usually happening after the sale, and always unknown to the seller at the time of it—the insolvency of the purchaser. 3 *Bos. & Pul.* 286. 2 *Kent's Com.* 393, 428. The stoppage does not take place on the happening of the insolvency, but the right to stop is thereby acquired. The acquisition of the right works no beneficial result to the seller unless he intercepts the goods in their transit. I have seen no case where this right has been held to attach on the death of the purchaser, if his estate was solvent. I think the seller could not, in such case, justify an interference with the goods sold while on their transit. It arises in case of death and insolvency, but not otherwise than it would exist in the case of insolvency alone.

A question asked by Lord Kenyon, in *Toole* v. *Hollingworth,* 5 *T. R.* 226, has given rise to a suggestion, that death prevents the delivery ; but the doubt entertained by that eminent judge did not spring from a case where there had been a sale. The property there had been sent to answer a particular purpose, which was to raise funds to meet the consignee's acceptance ; he, having becoming unable by reason of his insolvency to use them for that purpose, had no interest in them that went to his assignees. Where there is a general trading between two merchants residing at a distance from each other, and goods are sent by one to the other without being ordered, the title to them would not vest, as I conceive, in the merchant to whom they were sent until they were received and accepted. If he at once returned them as unfit for his use, or for any other cause, the title to them would not, in my opinion, have been changed. In such a

case Lord Kenyon might well ask, and mean thereby to express a strong doubt, whether the goods could be received by the executor if the consignee was dead when they arrived. The sending of goods, under such circumstances, amounts to no more than an offer to sell them to the party to whom they are sent, and his acceptance of them would be necessary to complete a bargain. If he should be dead before they arrived, there would be no contracting party to close the bargain by an acceptance. Chancellor Kent's remarks, on the question put by Lord Kenyon, show that he did not consider that a doubt of the nature of the one suggested could be indulged in a case where the title to the property had vested in the deceased person; for he says: "The language of the court," in the case last referred to, "seems to be, that goods sent to a person, who at the time was dead or disabled by bankruptcy from dealing, and *under an incapacity to acquire property*, could be recovered back upon the principle that there was no contract." 7 *John. C. R.* 275.

Waiving all the other difficulties that were presented in opposition to Frith's right to stop the 50 pipes of brandy, and granting at the same time that he had the right, and that they were to be considered as in their transit while they remained in the custody of the custom house officer at New-York, it may be asked what did he do to stay the delivery of them to the administrators of Mactier? Did he make an effort to get possession of them? did he forbid the public officer to deliver them to the administrators? This I believe is not pretended. The administrators took possession of them in May or June, and sold them about that time as a part of the estate of their intestate, and the first act in relation to them on the part of Frith was in July. They had a right to the brandy as property vested in Mactier at the time of his death by virtue of the contract of sale; and they can rightfully hold the avails thereof, unless Frith had rescinded the contract by stopping the brandy in its transit before it came to their actual possession. This he did not do, nor did he perform any other act equivalent to it.

Upon the view of the whole of this case, I entertain the opinion that the decree of the chancellor ought to be reversed.

By Mr. Senator BENTON. From the pleadings and testimony in the cause, there can be no ground for the assumption set up by the respondent that he was the sole owner, and was alone interested in the brandy. The answer of the appellants is, in my opinion, substantially supported by the proofs. We are then to assume that the intestate and respondents were partners, or jointly interested in the two hundred pipes of brandy; to share equally in the profits, or to bear the loss jointly, if any should be sustained. The transaction was to be extended so as ultimately to pay the invoice cost in France by a shipment of coffee from the West Indies, which latter operation was to result from provisions shipped from the country to the West Indies. It is worthy of notice that by the arrangement the brandy was to be shipped from France for New-York in an American vessel, and the coffee was to be sent in a French bottom from the West Indies; and this undoubtedly with a view to advantages to result to the parties to the speculation.

The respondent, by his letter, dated September 5th, 1822, to his agents in France, having ordered the brandy to be sent out to the consignment of the intestate, and directing the invoice amount to be insured, on the 24th December, 1822, wrote the intestate to the following effect : " I also have the pleasure of handing you copies of Messrs. Firebrace, Davidson & Co.'s letters regarding the brandy order. By the bye, as your brother, before I left New-York, declined taking the interest I offered him in this speculation, and wishing to confine myself on business as much as possible, so as to bring my concerns to a certain focus, *I would propose to you* to take the adventure solely on your own account, holding the value to cover the transaction to my account in New-York."

This, it appears to me, is a distinct and unconditional offer to dispose of the interest and property in the shipment of brandy at its value : that is, the invoice cost in France, or its value or price in the market of consumption. And in this case, it cannot, I apprehend, be material which was intended by the respondent, because the question here presented does not involve that particular inquiry. And if the offer was accepted, the intestate was only to carry the amount

to the credit of the respondent, holding the same to cover any transaction which he might deem it advisable to negotiate in New-York.

On the 17th January, 1823, the intestate, in answer to this proposition, wrote as follows: "I thank you for sending me the copy of Firebrace, Davidson & Co.'s letter on the subject of the brandy order. This has been, from the first, a favorite speculation with me, and am pleased to say it still promises a favorable result; but to render it complete, I am desirous the speculation should go forward in the way first proposed, thereby making it a treble operation. As you have however, expressed a wish that I should take the adventure to my own account, I shall delay coming to any determination till I again hear from you. The prospect of war between France and Spain may defeat the object of this speculation, as far as relates to the shipment of provisions hence to Hayti, to be invested in coffee for France per French vessels, in which case I will at once decide to take the adventure to my own account." The intestate then states, as his opinion, that the war would operate to the disadvantage of the respondent in relation, I suppose, to the transactions connected with the purchase of the brandy and the shipment of coffee to France. This letter, although it is not an acceptance of the proposition contained in the respondent's to take immediate effect, is not a rejection of it; the intestate replies, he should delay coming to any determination in regard to the wish expressed that he should take the adventure on his own account, until he again heard from the respondent; and in another part of the letter he states, that should a war intervene between France and Spain, which would, he assumes, defeat the objects of the speculation in the particulars therein enumerated, he would decide to take the adventure to his own account.

Under date of March 7th, 1823, the respondent wrote the intestate, acknowledging the receipt of the letter dated January 17th, above referred to; but nothing is said about this letter, except that the contents were noticed. The letter from the intestate to the respondent, dated March 13th, 1823, advised the respondent that he had been informed of

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

the shipment of the brandy in a French ship, that he was looking daily for its arrival, and expressing his regrets that the order had not been more promptly executed, as the delay would be likely to prove disadvantageous to him and the respondent. At this time the intestate was advised that a war between France and Spain was inevitable; that France had recalled her minister, and that a large French army had been ordered into Spain, and that the American insurance offices declined insuring on French vessels.

On the 28th March, 1823, the respondent wrote the intestate to the following effect, in relation to the brandy transaction : " I have not heard any thing more from Firebrace, Davidson & Co. respecting the brandy, but I have little doubt of its having got out to you long ere this, unless the rupture which we have a report of between France and Spain took place before the sailing of the vessel, or that she has been captured by the Spaniards; if either be the case, it would be a pity, as its safe arrival with you would be much enhanced if there be a war. With respect to this adventure, I would wish you to *confirm*, if altogether satisfactory to you, what I mentioned to you some time ago, and which I omitted to repeat to you in my previous letter in reply to yours of the 17th January. I find the more one does in this country, in the present state of trade, the more one's affairs get shackled." The letter here mentioned as the one in reply to that of the 17th January, is the letter from the respondent to the intestate, under date of March 7th, 1823. It is alleged that the above, under date of March 28th, did not arrive at its destination until after the death of the intestate.

But what inference can properly, and without violence, be drawn from the contents of this last letter from the respondent? What is the plain and fair import of it? It appears to me the respondent fully acquiesced in the proposal of the intestate to consider the offers made by the letter of the 24th December, 1822, as open, and still at the option of the intestate to accept or refuse, as he might think proper. The respondent's mind had probably at all times no other inclination than to hold his offers open to the intestate, and he had so intended to have expressed himself in his reply under date

of March 7th ; for he says he wished *to confirm* what he mentioned some time ago, and which he omitted to repeat in his previous letter in reply to the one from the intestate of the 17th January. This letter, I apprehend, affords sufficient evidence of the fact that the respondent did not consider his propositions as rejected by the intestate, although they had not been in terms accepted by him, from any communications which had been received at its date. It would, I apprehend, be competent for the appellants in this case to prove that the respondent had, up to the date of this letter, considered the intestate at liberty, and that he had the right to take the adventure to his own account ; that the offer contained in the letter of the 24th December was still open to him. If I am correct in this conclusion, then I do not perceive why this letter does not afford sufficient evidence that the respondent never considered the intestate as concluded or barred from accepting them.

Then, under date of March 25th, 1823, and within the time above assumed, the intestate wrote the respondent and said : "I have now to advise the arrival of the French ship La Claire with the 200 pipes of brandy, and that in consequence of the probability of war between France and Spain, and in compliance with the wish expressd in your regarded favor of the 24th December, and my answer thereto of the 17th January last, I have decided to take this adventure to my own account. I therefore credit you with the amount of the invoice, say fr. 76978-58, which, at the exchange of the day, 5–40, makes the sum of $14,254$\frac{57}{100}$, of which you will please to take note." Here the intestate closed with the respondent's proposal ; and was it done in time to constitute a contract binding upon the parties? On the 21st of April following, the respondent wrote the intestate, advising him of the receipt of the above letter of the 25th March, noting particularly the contents, to which he had replied, he says, by his previous respects; and although he was then indebted to the intestate in a considerable sum, if we do not take into view the amount of the price or value of the brandy, he requested the intestate to charter on his account a staunch first class vessel, and send out to him by her a valuable cargo of provisions and merchandizes ; the vessel *to proceed*

ALBANY,
Dec. 1830.
〰〰〰
Mactier
v.
Frith.

to Europe with a cargo of coffee. The intestate resided in New-York, and it is admitted by the case that he died on the 10th day of April, 1823. The respondent, at the time this transaction and correspondence took place, was a resident of Jacmel, in the island of St. Domingo. There are several other letters from the respondent to the intestate, which I deem not necessary to advert to in the view here taken of this case.

Upon a rigid and critical examination of the correspondence and the testimony, I am unable to perceive that the respondent ever intimated to the intestate that he withdrew his proposition of the 24th December, offering to dispose of his interest in his shipment of brandy, or that he considered the intestate's letter of the 17th January as a rejection of that offer; but, on the other hand, the letter from the respondent of the 28th March shews pretty clearly, not only that this was not so considered by him, but that he wished *to confirm* what he had previously written, urging the intestate to close with the offer upon the terms proposed in the letter of the 24th December. This would not probably have been done in the terms here used, if the proposition for the sale had been considered as rejected.

It cannot, I apprehend, be contented with any probability of success, that the respondent's letter of the 21st April contains any matter which goes to shew he did not consider the first offer of sale on his part, as still open. The respondent must have known, and did know no doubt, that when he wrote this last letter, his previous letter to the intestate, dated March 28th, had not been received when the letter under date of March 25th was written, advising that the adventure had been taken agreeably to the proposition contained in the respondent's letter of the 24th December.

In my opinion it was competent for the respondent to have limited the time in which his offer might have been accepted, and to have stated, if you accept by the 1st of April, it will be in time, or he might have left the proposals open indefinitely. When advised of the safe arrival of the brandy, and that the intestate had decided to take it to his own account, and while he still supposed the intestate was alive, the re-

spondent made no objection, but acquiesced in what had been done. It is not urged that the contract depends upon either of the letters written by the respondent which were not received by the intestate in his life time, any farther than those letters afford evidence of the mind and intent of the party.

If this mode of reasoning, in relation to the facts in this case be correct, and the intestate accepted of an offer tendered to him by the respondent, then was it necessary for the intestate to know, before the contract was finally closed and binding upon the parties to it, whether the respondent assented or not?

This brings me to a consideration of the law involved in this case.

In the construction of contracts and agreements, the intention of the parties and the substance of the contract are to be sought for more than the form of the words. *Pothier* says we ought to examine what was the common intent of the contracting parties, rather than the grammatical sense of the terms; 2 *Comyn on Contracts*, 533; and *Plowden* lays down a rule, that in contracts it is not material which of the parties speak the words, if the other agrees to them; for the agreement of the minds of the parties is the only thing the law respects in contracts; and such words as express the assent of the parties and have substance in them are sufficient. And again; if any persons are agreed upon a thing, and words are expressed or written to make the agreement, although they are not apt and usual words, yet, if they have substance in them tending to the effect proposed, the law will take them to be of the same effect as usual words; for the law always regards the intention of the parties, and will apply the words to that which in common presumption may be given to their intent. Chief Baron *Comyn* also states, that an agreement or contract shall have a reasonable construction according to the intent of the parties; and the rule of construction adopted by the courts in this state and in England, is that in case of doubt, the words of a promise or covenant shall be taken most strongly against the promissor or covenantor. An agreement is *aggregatio mentium*; that is,

where two or more minds are united in a thing done or to be done, or where a mutual assent is given to do or not to do a particular act; and every contract or agreement ought to be so certain and complete that each party may have an action or other remedy upon it.

These general principles appear to be full of sound sense and good reason. A review of the numerous adjudged cases which have a bearing either directly or indirectly upon the questions now under consideration, seems to me not necessary. I shall therefore advert to one of them only.

The case of *Cook* v. *Ludlow*, 5 *Bos. & Pul.* 2 *N. R.* 119, was this: The defendant, who resided near Bristol, by letter requested the plaintiff, who lived in London, to send by any conveyance which would reach Bristol, a patent chaff-cutter and two or three pairs of knives, and also requested that he might be informed when the same were sent, that he might know when and where to send for the articles. The articles were sent to a wharf in London, directed to the defendant, and the wharfinger's receipt taken by the plaintiff. The defendant was advised by mail that the articles had been shipped by a vessel called the Commerce, Chas. Forquareau. The package containing the chaff-cutter and knives was not in fact shipped for Bristol by the Commerce, but was put on board the Nancy, which left London about three months after the articles were delivered at the wharf. No correspondence or communication passed between the parties for about fifteen months after the goods were actually shipped, when the plaintiff applied for payment of the demand, who shortly afterwards received a letter from the defendant stating that he had not received any chaff-cutter, although he had repeatedly enquired for it at Bristol until the time of the arrival of the Commerce. The plaintiff then wrote the defendant, informing him that on inquiry it was ascertained that the package, containing the chaff-cutter, had been sent by the Nancy to Bristol, and this was the first intimation the defendant received that the chaff-cutter had been sent by this vessel. The question in this case was, whether the plaintiff was entitled to recover, and the court held he was, observing, the article was sent in the common course ac-

cording to order, and the defendant was bound to give no-
tice in due time that he had not received it.   Heath and
Rooke, justices, observing that the plaintiff had done every
thing in that case he was bound to do, and the defendant
was guilty of gross negligence in not giving earlier notice.
In this case, I apprehend, the contract of sale was consum-
mated upon the delivery of the goods agreeable to the de-
fendant's order, and took effect from the time of such deliv-
ery at the wharf or place from whence they were to be
transported to the defendant at Bristol.   The wharfinger or
carrier was neither of them the agent of the plaintiff.   Here
the minds of the parties met, because the orders of the de-
fendant had been strictly followed and attended to, but did
the defendant know the fact at the time it was done?   Let
us suppose a case that might have arisen in the cause under
consideration, and test it by the above rule.   Had Fire-
brace, Davidson & Co. shipped the two hundred pipes of bran-
dy in conformity to the order of the respondent upon them,
would he have been at liberty to refuse taking it, on its arrival
in this country, and would he have been held not liable to pay
the amount of the invoice price, suppose it to have been lost
by shipwreck, or capture?   I do not doubt but the respon-
dent would have been liable to pay for the shipment of bran-
dy from the time the terms of his order had been fulfilled;
and this too, although he might not have known that the ar-
ticle had been sent.   The minds of the parties met at the
time the brandy was actually shipped agreeably to directions.

Entertaining no doubt of the fact that the respondent at
all times, up to the 21st of April, considered his offer of the
24th of December, 1822, as open to the intestate for his ac-
ceptance upon the terms offered, the letter of acceptance of
the 25th of March, 1823, closing with the terms of the offer,
consummated a valid and binding contract between the par-
ties; and from that time the intestate was liable to the res-
pondent for the full amount of the value.   But it is now urg-
ed by the respondent that certain information was withheld
by the intestate, and that he has lost the interest on the
amount, and that there was a difference in the rate of ex-
change, which operated against him between the time the

offer was made and the acceptance; such, however, was not his complaint when he wrote the intestate on the 21st April. As a general creditor, he might be entitled to interest, and compensation for any loss he might have sustained in consequence of the rate of exchange, being more to his disadvantage at the time the contract was closed, than it was when the offer was made. Sound policy forbids that mercantile contracts should depend for their validity upon considerations of this kind.

Having arrived at the conclusion, that here was an absolute sale of all the right and interest of the respondent to the shipment of brandy, it now remains to enquire, whether he has a lien upon the whole or any part of it as a creditor, and whether the doctrine of stoppage *in transitu*, is applicable. If I am right in respect to the sale of the respondent's interest, then clearly the *transitus* is gone as to one-hundred and fifty pipes of brandy, which were sold in the lifetime of the intestate; the subject was entirely out of the possession of the vendor; and I did not understand that it was contended upon the argument, that the right of the respondent to this portion of the adventure could be sustained upon this principle, if a contract had been made.

The question in regard to the fifty pipes seems to me, to be presented in the following shape, and accompanied with these peculiar circumstances. The goods were in the possession of the vendor and vendee, as partners by legal construction. The respondent was never in actual possession, except by the intestate ; and according to the position here assumed the goods were in the actual and uncontrolable possession of the intestate, and when the contract was finally closed, the fifty pipes of brandy lay in the public store, under the direction of the vendee, who was himself joint owner with the respondent. The *transitus* of the goods, and consequently the right of stoppage, is determined by the actual delivery to the vendee, or by circumstances which are equivalent to actual delivery. It will continue until the place of delivery be in fact the end of the journey of the goods, and they have arrived to the possession, or under the direction of the vendee himself.  **2** *Kent's Comm.* 430.  If the goods

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

have arrived at an intermediate place, where they are placed under the orders of the vendee, and are to remain stationary until they receive his directions to put them again in motion for some new and ulterior destination, the transitus is gone. 2 *Kent's Comm.* 431. The goods in this case were not in their transit, they had arrived at their destination, and were under the dominion, and subject to the ownership of the intestate. Nothing remained to be done by the respondent to complete the transfer of the brandy.

But in my judgment, another view of the case is equally fatal to the claim here set up in regard to this lien. The brandy had been actually sold, and was out of the possession of the defendants, previous to the commencement of this suit. It had been taken from the custom house store, the duties paid, and actually sold to *bona fide* purchasers; and, we must here assume, without notice, before the respondent made any claim. The administrators acting in good faith, and in pursuance of an equitable and legal right, are certainly to be protected, if it should be necessary for a court of equity to interpose.

Entertaining no doubt upon this branch of the case, and being of opinion that the respondent is not entitled to have the decree modified so as to give him a claim upon the fifty pipes of brandy, or the proceeds thereof, in the hands of the administrators, I am of opinion that so much of the decree of the court of chancery as is appealed from be reversed; that the respondent's first exception to the master's report be disallowed, and that the appellants recover their costs for prosecuting their appeal in this court.

On the subject of costs in this court, as they rest in discretion, it might perhaps be deemed equitable that neither party should have costs: but the appellants are prosecuting this appeal not in their own right, but as the personal representatives of the deceased, and to protect the interests of the general creditors. And if, as is is here supposed, the respondent has no rights but those of a general creditor, it is not perceived why he should be entitled to any peculiar favor, when his case is not one of greater hardship than any one of those against whom he has been litigating.

By Mr. Senator MAYNARD. The most material question for discussion in this case, is whether the respondent, John A. Frith, was the owner of the brandy mentioned in the case, or of any part thereof, at the time of the sale of a part by Henry Mactier, and of the residue at the period of his death ; or whether Frith had sold his interest, whatever it had been, in that brandy to Mactier. From the letter of Mactier to Frith, of the 4th of September 1822, and the order of Frith of the day following, it is evident, that the brandy was purchased in France, on the *joint account* of Frith and Mactier. The agreement was that Frith should order the brandy, that Mactier should ship to Frith at Jacmel the invoice price of the brandy, in provisions, from the sale of which, Frith was to make a shipment of coffee to France, to pay for the brandy, and the parties were to share equally in the speculation " all around." The testimony of Alexander Mactier, proves also, that such was the arrangement, and that it was clearly so understood by Frith. The brandy having been ordered on the joint account of Frith and Mactier, I agree perfectly with the chancellor in opinion, that Frith never was the " sole owner of the brandy." It is now contended that the decree is wrong, in giving to Frith the proceeds of the whole, even if he were entitled to a specific lien upon the brandy, to the extent of his interest. The conclusion to which I have arrived on the main question, renders a decision of this unnecessary.

On the 24th of December, 1822, Frith wrote from Jacmel to Mactier, conveying letters regarding the order for the brandy, and proposed to him to " take the adventure solely on his own account, holding the value to cover the transaction to the account of Frith." Mactier answered this letter on the 17th January, 1823, and informed Frith that he was desirous the speculation should go forward in the way first proposed, thereby making it " a treble operation ;" and declaring that " he should delay coming to any determination until he again heard from him." He promised also, in the event of war between France and Spain, the prospect of which he mentioned, to decide at once " to take the adventure to his own account." This was undoubtedly such an

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

answer as absolved Frith from all obligation on account of his offer, but I cannot consider it as an absolute refusal, on the part of Mactier.  He engages absolutely to accede to the proposition in the event of a certain occurrence deemed to be disadvantageous to Frith, and declines coming to a determination until he again heard from him, in case the contingency contemplated should not happen.  He certainly does not close the negotiation, but holds out to Frith, at least, the possibility of a compliance with his proposal, if he should continue to desire it.   On the 13th of March, Mactier wrote to Frith that war between France and Spain might then be considered as " inevitable," and gives him the facts upon which that opinion was founded; states that he was " looking daily for the brandy, and regretted that the order for it had not been more promptly executed, as the delay might operate to their disadvantage."   At that time he had heard nothing further from Frith in relation to the proposal " to take the adventure" to his own account, and he did not then indicate a determination to do it.   Frith on the 7th of March, in a hasty note, acknowledged the receipt of Mactier's letter of the 17th of January, and one of a subsequent date; and states that he " noted their respective contents," but says nothing directly on the subject of his previous proposition.  On the 28th of March, Frith wrote to Mactier, that " he had little doubt of the brandy having got out to him long ere this."  And he adds, " with regard to this adventure, I would wish to confirm, if altogether satisfactory to you, what I mentioned to you sometime ago, and which I omitted to repeat to you in my previous letter in reply to yours of the 17th of January."  I know there is a difference in the reading of the two copies of this letter given in evidence, in the part relating to this subject.  I adopt this as correct, because, according to the other, there is a palpable mistake, and I cannot perceive any difference in the meaning so far as they concern the question under consideration.  According to either there is an express confirmation of the proposition to Mactier, " to take the adventure to his sole account;" and it is evident also, from that letter that Frith intended to renew the offer in his letter of the 7th of March, in answer to the letter of Mactier

of the 17th of January. It furnishes evidence therefore that his mind had undergone no change in relation to the proposition.

On the 25th and 31st of March, Mactier wrote to Frith that he had decided to take the brandy to his own account, according to the proposition contained in the letter of the 24th of December, 1822, and his own engagement in his letter in answer thereto, the contingency upon which it was made having occurred, and informed him that he had carried to his account the invoice price thereof, at a specified rate of exchange. The 21st of April, Frith answered this letter and another of the 5th, and assured him that he had "noted their respective contents," and refers him to his own letters of the 28th of March and 12th of April, for a reply. Frith wrote again on the 22d of April, confirming his letter of the day before, and again the 6th of May, confirming both the last mentioned letters, and on the 15th of May, confirming the last preceding letter. The brandy arrived, and was landed on the 15th of March, and on the 10th of April, Mactier died.

The question is then presented for decision, whether this correspondence and these acts of the parties constitute a sale of the brandy.

To make a contract there must be an agreement—a meeting of the minds of the contracting parties. On the 28th March the minds of these parties certainly did meet. On that day, Frith wrote to Mactier, renewing and confirming his previous proposition to him "to take the adventure to his sole account," and on that day Mactier actually did take it to his "sole account." Here was an actual meeting of the minds of the parties on the subject of the contract, and a decisive act of one of them, giving it entire effect. If the meeting of the minds of the parties, accompanied by the only act necessary to give complete effect to the contemplated contract, are all the circumstances requisite to constitute a valid contract, then there was in this instance a sale of the commodity in question. But his honor, the chancellor, has said, that, "to make a valid contract, it is not only necessary that the minds of the contracting parties should meet, but they should know that fact." If this be a correct principle,

and of universal application, then surely in this case there was no contract. The letter of Frith, of the 28th of March, and all subsequently written by him, did not reach this country until after the death of Mactier. Can this principle be correct and universal? The parties were distant, and negotiating for the sale of a commodity in the possession of one of them. The adventure was agreed upon, and the brandy ordered on the 5th of September, "to be in New-York by January following, or sooner, if possible." When Frith wrote his letter of December 24th, he must have believed that the brandy would have arrived at New-York before his letter, or, at all events, before he could receive an answer. If such had been the fact, and the brandy had been in the actual possession of Mactier, to whom it was consigned, will it be contended that he must have forborne "to take the adventure" to himself, according to the proposition, until he had informed Frith that he would do so, and received intelligence from him that he was in possession of that information? I cannot believe that the principle can be carried to that extent. Nor can I perceive why it would not have been a valid contract, if the brandy had actually arrived at the receipt of Frith's proposition, if Mactier had immediately "taken the adventure to himself," and credited Frith with the value. If that would have been a contract, binding upon the parties, then it is not universally true that the minds of contracting parties must not only meet, but that they must know that they do meet, before the agreement becomes a contract. If this principle be correct and universal, it is difficult to conceive when a contract would ever be concluded between distant parties. An offer may be revoked at any time before it is accepted. When a party, who has received an offer, sends his acceptance, he does not know that the minds of the parties meet, because he knows that a revocation of the offer may be on its way. When the party who made the offer receives the acceptance, he cannot know that there is a meeting of minds, because he knows that the acceptance may have been revoked. And when the party accepting receives information that his acceptance is received and the offer confirmed, he is in equal uncertainty as to

the meeting of minds, because there may have been a revocation of that confirmation. Such a negotiation would be endless, for the parties could never know that their minds met. The impossibility of arriving at certainty, and consequently the intrinsic difficulty of giving effect to this principle, shews that as a rule, it must have some exceptions. One of these instances, it appears to me, must be where the parties are distant, and one of them has the power by his own act to give full effect to the contract, and he does that act in accordance with the mind of the other. In support of the chancellor's opinion, reference has been made to the case of *McCullcck* v. *Eagle Ins. Co.*, 1 *Pick.* 278; but I find nothing in that case decisive on this point. That was a case of revocation. On the 29th of December, the plaintiff sent a letter by mail to the defendants, making enquiries how they would insure a vessel and cargo, but making no offer by which he could be bound. On the first of January the defendants wrote him that they would insure on certain terms, and the next day wrote him again, revoking that offer, and declining to effect any insurance. The plaintiff received the offer to insure on the third, and sent an acceptance before he received the revocation, which reached him in due course of the mail. The parties rested until the loss was ascertained; and the court held there was no contract; and surely, there was not, because the offer to insure was revoked before it was accepted, and on that point the cause was decided. The case would have been very different if the plaintiff had requested the defendants to make out a policy upon his vessel and cargo at a specified premium, and deliver it to his agent, and the defendants had actually complied with his request. In the present case, Frith proposed to Mactier " to take the adventure solely to his own account," on certain terms. Mactier replied, not accepting, discouraging but not rejecting the proposition ; holding it for further negotiation in one event, and promising absolutely to accede to it on the occurrence of another contingency. The proposition remained, neither rejected by one, nor revoked or modified by the other. The brandy arrived, preceded by information of the occurrence of the contingency on which Mactier had prom-

ised to take the adventure to himself.   After a few days employed in consultation with his friends as to his obligation, he did accede to the proposition, and did all that was necessary to give effect to the contract.   It is urged that the letters of Frith, which reached this country after the death of Mactier, cannot make a contract.   Most certainly they cannot; but they furnish evidence that one had been made before, by proving an actual meeting of the minds of the parties, if a contract can be made without a mutual and reciprocal knowledge of such meeting.   And if a contract cannot be made without that knowledge, those letters would not have constituted a contract, if they had reached this country in the lifetime of Mactier.   They prove all now, that they would have proved, if the death had not occurred. They never would have proved that each party knew the minds met.   They prove that the mind of Frith had undergone no change; that he continued the proposition; that his mind was the same on the 28th of March, when Mactier actually took the adventure to himself, as it was on the 24th of December, when he proposed to have him do it.   A valid contract was therefore made, by the act of Mactier, on the 28th of March, if the same act would have made one on the 17th of January, when he wrote his reply to the proposition.

It is alleged that three fourths of the brandy had been sold by Mactier at a profit, before he decided to comply with the proposition, and that a knowledge of that fact was essential to Frith, to enable him to act understandingly, and that he ought not to be bound, because it had not been communicated.   The parties intended, when they engaged in the adventure, that the brandy should arrived in New-York in or before the month of January.   Frith, in his letter of March 28th, expresses the opinion that it had arrived long before that date. When he made the proposition in December, he acted upon the belief that the brandy would soon arrive, if it had not already arrived; and when he confirmed it, he acted upon the assumption that it had then been a long time in the possession of Mactier.   Frith therefore acted precisely as he would have done if he had possessed positive knowledge of its arri-

val. Can it be contended that Mactier had not a right to sell the brandy? If it be true that he was bound to keep it until the completion of the contract between him and Frith, and if it be essential to the validity of that contract that the parties should reciprocally have had knowledge that their minds met, it is difficult to determine at what period he would have been at liberty to sell. If there was a sale to him of Frith's interest, he had a right to sell it as his own, and if there was not, he had a right in fulfilment of the original purpose of the adventure. His right to sell, therefore, in either alternative was indisputable, and Frith must have presumed that he would embrace a good opportunity. I cannot perceive what bearing the fact of profit or loss has upon the question of contract. The parties engaged in the adventure in the hope of making profit. Nothing had occurred to diminish their expectations on the 24th of December, when Frith made his proposition; and on the 28th of March, when he renewed and confirmed it, he expresses the opinion that its "safe arrival," which he believed had taken place, "would be much enhanced, if there be a war," of which there was then, to his vision and in fact, a clear prospect. He believed, at first and always, that the adventure would be profitable; and when he confirmed his proposition to sell, he, for a manifest reason, anticipated larger profits than at the time of his engagement. It could not have been necessary that he should have had information of a fact of which he entertained a full belief, and the amount of profit actually realized was too small to justify an inference that it exceeded his expectations. He believed the adventure would be profitable, and it is incredible that he intended Mactier should take it to his sole account, only in the event of its proving disastrous. The arrival and sale of the brandy at a moderate profit were to him matters of no importance. He believed both, and made and confirmed his proposition to sell upon that assumption.

It is further alleged in the bill, that by the rate of exchange specified in Mactier's letter of the 25th of March, Frith would have been a loser in consequence of having placed his funds in France for the payment of the brandy at

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

a higher rate of exchange, and also for the want of a provis-
ion for the payment of interest. The question is, did Mac-
tier comply with Frith's proposition? In his letter of De-
cember 24th, Frith proposed to Mactier to take the adven-
ture to his sole account, "holding the value to cover the
transaction to his account in New-York." What was its val-
ue in reference to covering the transaction? It had no value
for that purpose other than its cost. There was no men-
tion in the proposition of interest, or the rate of exchange.
Mactier certainly intended to meet that proposition. He as-
sumed upon himself the payment of all charges, and took the
brandy at its invoice price as the evidence of its value, and
at a rate of exchange which was the exchange of the day.
There was, in his attempted compliance with the proposition,
no intentional departure or omission; nor is there evidence
that there was any in fact, but there is evidence that this al-
legation is groundless. When Frith wrote his letter of the
21st of April, he had Mactier's letter, and knew therefore
precisely the terms on which the brandy had been taken.
The price and the rate of exchange are expressly mentioned.
He wrote three letters afterwards, with his mind turned to
the subject, and without expressing in any one of them a sin-
gle word of disapprobation or complaint. If the price at
which Mactier had taken the brandy was not what he meant
by its value, or the rate of exchange was inaccurate, it be-
came him to speak immediately. When he had all needful
information, and should have spoken if he had cause for dis-
satisfaction, he was silent. It is true, those letters arriving
after the death of Mactier do not make a contract, but they
prove that Frith was then satisfied, and did not imagine that
injustice had been done him. He did more than acquiesce;
he sought to avail himself of the funds which the transaction
had placed to his credit in the hands of Mactier. To that
period, Frith had been his debtor. In his letter of the 24th
of December, he "promised it should not be long before he
made a remittance, and, he trusted, to his satisfaction." In
his letter of the 28th of March, he regrets that he has not
been able "to remit further, and hoped soon to put him in
considerable funds of his." He had, pending the negotia-

tion, supplied Mactier with some bills; but if the avails of them had been realized, he was still his debtor to the amount of several thousand dollars. In his letter of the 21st of April, written on the receipt of information that Mactier had taken the adventure to himself, he requests Mactier to charter for him a "first class vessel," for a voyage to the Mediterranean, and load her with a specified cargo on his account, and says not a word about funds, and makes no provision for payment. He had then before him Mactier's letter, informing him of the amount of the proceeds of the brandy, and that they were placed to his credit. He then perceived that instead of being the reluctant debtor, he had become the creditor of Mactier, to the amount of more than nine thousand dollars. All his regrets at not being able to supply him with funds had vanished, and he sought immediately to avail himself of those which that transaction had placed at his command. From all this, I infer that he was content and satisfied, not only with the fact that Mactier had taken the brandy to himself, but with all the terms upon which he had taken it.

I come therefore to the conclusion that the proposition from Frith to Mactier was *continued*, neither rejected, revoked nor modified; that its acceptance depended upon the act of Mactier; that he did the act which alone was necessary to meet the proposition and complete the contract, in exact accordance with the mind of Frith, and to his perfect satisfaction at the time; and that consequently a sale of his interest was effected, and he was not the owner of the brandy at the time of the sale of a part of it by Mactier, or the residue at his death, and that the decree of the chancellor should be reversed.

By Mr. Senator OLIVER. The first question which I deem important to the decision of this appeal is, was Mactier originally *a joint owner* with Frith in the 200 pipes of brandy?

From the form of the order and letter of Mactier to Frith of the 4th September, 1822, the letter of Frith to Firebrace, Davidson & Co. ordering the brandy, and the testimony of Alexander Mactier, and Frith's letter of the 24th of Decem-

ber, 1822, in which he says, " By the bye, as your brother before I left New-York, declined taking the interest I offered him in this" (the brandy) " speculation, I would propose to you to take the adventure *solely* on your own account." It seems to me that Mactier was originally equally interested with Frith in the 200 pipes of brandy ; and when he speaks of Mactier taking the adventure *solely* on his own account, he must have meant that he should take the other half of the brandy off his hands.   Again ; this evidence proves the partnership was agreed upon for this adventure before the brandy was bought ; that it was purchased by Frith for their joint benefit, and so they were joint vendees, and liable for the purchase money.   12 *East*, 421.

Did Mactier purchase the other half of the brandy ?   To answer this question, it becomes important to examine again a part of the correspondence between Frith and Mactier. Frith's letter of the 24th of December contained, as we have seen, a distinct proposition to part with his interest in the adventure of brandy ; that Mactier should take it solely to his own account ; that is, take the brandy at the invoice price. All Frith wanted, was to have the brandy off his hands.   On the 17th of January, 1823, Mactier writes to Frith on the subject of their business, and in answer to the proposition of taking the brandy to his own account, he says : " This has been from the first a favorite speculation with me, and am pleased to say it still promises a favorable result ; but to render it complete, I am desirous the speculation should go forward in the way first proposed, thereby making it a treble operation ; as you have, however, expressed a wish that I should take the adventure to my own account, *I shall delay* coming to any determination till I *again hear from you.*   Prospects of war between France and Spain may defeat the object of this speculation, as far as relates to the shipment of provisions hence to Hayti, to be invested in coffee for France, in which case I will at once decide to take the adventure to my own account."   Thus far, I am inclined to think, there was an agreement on the part of Mactier to accept the proposition on a certain event, and a mere postponement of accepting absolutely until he should hear from Frith, in hopes

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

Frith would yet be willing to proceed with the speculation. It may be said that Mactier, in his letter of the 13th March, speaks of the brandy as joint property. This is true; he had written to Frith that he should wait until he should hear from him. Frith must have known that Mactier considered the proposition as one under consideration, not rejected; for on the 7th of March, he says, in answer to Mactier's letter of the 17th January, " I have received your esteemed favor of the 17th and 31st of January, and *note their respective contents.*" The effect of this letter was either an assent to Mactier's qualification to take the brandy on the happening of the war, or a continuance of his first proposal. Frith's answer, not declining this modification, was a virtual assent to it. If he did not mean to assent, he should have said so to Mactier, and not let Mactier go on as if he had agreed. I think good faith required Frith to make known his *assent* or *dissent* to this qualification of Mactier. What was Frith's meaning? " I have received your esteemed favors, and noted their respective contents." In *Noy's Maxims*, 91, it is said : "In all contracts, he that speaketh obscurely or ambiguously is said to speak at his own peril, and such speeches are to be taken strongly against himself." In *Powell on Contracts*, 80, and 1 *Livermore,* 49, it is said, " a tacit assent may be inferred from inaction or forbearance of acting. Thus a man by his silence, in case he be present and acquainted with what is doing, is supposed to give his assent, unless it appear that he was hindered from speaking." Again ; if this was not an acceptance of Mactier's modification, it was virtually permitting the original offer to stand, that Mactier might determine to take the brandy or not, as he said he should on hearing further. In *Pothier on Contracts, pt.* 1, *sec.* 11, *no.* 31, 32, it is said, that " In the contract of sale, as in other contracts, the consent of the parties can intervene, not only between persons present, but between the absent, by letters or by messenger. In order that the consent should intervene in the latter case, it is necessary that the will of the party who has written to the other to propose to him the bargain, shall have continued until the time at which his letter shall have reached the other party, and at which the other party shall have declared that he

accepted the bargain. This will is presumed to have continued, so long as nothing appears to the contrary." Must it not be so upon general principles? Again; in 3 *Starkie on Evidence*, 1252, it is said, "Where the existence of a particular subject matter or relation has once been proved, its continuance is presumed till proof be given to the contrary." Lord *Ellenborough*, in 16 *East*, 55, remarks, "It is fair to presume things continue in the same state, in the absence of all proof of their having been altered."

I admit that this presumption may be rebutted by lapse of time, or by the fact that the brandy was in an unsafe or perishable condition, which is not the case here. In the present case, the continuance of the vendor's proposition is not left to presumption alone, as in ordinary cases; Frith shows the continuance affirmatively by his letters, and thus places it beyond mere presumption, either one way or the other. He remarks in his letter of the 28th March, "with regard to this adventure, I would wish to confirm, if altogether satisfactory to you, what I mentioned to you in my previous letter, in reply to yours of the 17th of January." It is manifest from this that he still wished to sell as he before offered. If this is not sufficient to show his intention to sell, his letters of the 21st and 22d of April, clearly prove that Frith never changed his mind as to selling the brandy; that he considered the offer to sell, open, and not withdrawn or retracted, but accepted; for his letter of the 21st of April was after receiving Mactier's letter, saying that he had taken the brandy. On the 25th of March, their minds meet. This completes the sale in the present case; a formal delivery of the brandy was not necessary, as it was in Mactier's possession. It was urged on the argument, that these letters of April and May, could not confirm the sale, as Mactier died before they were written, to wit, on the tenth of April; but to my understanding, there is sufficient without these letters. It appears to me as I have before remarked, that Frith's letter of the 28th of March, and the two in April, and his last of the 6th of May are sufficient to show that the complainant's mind and continued desire, was to sell.

Again ; what must Mactier have supposed ? he had done all in his power to the final consummation of this sale ; Frith, by his subsequent act, it seems to me, ratified, and Mactier's death could make no difference ; it related to the time of Mactier's letter, and confirmed his acceptance and perfected the sale by that relation.  2 *East*, 227.  Frith could have insisted upon and enforced the bargain, and the administrators could not have refused.

Again ; in 2d *Ld. Raym.* 930, *Holt* says, "a consent subsequent will amount to an authority precedent."  In 1 *Livermore*, 445, 9, *per Powell, J.* "a subsequent ratification is equivalent to an original authority.  Again ; "there are three sorts of agreements ; an agreement executed, an agreement subsequent to a thing done, and an agreement executory.  *Plowd.* 5, *a.* 6, *a.*  In *Comyn's Dig. tit. Agreement, A.* 1, these rules are all cited.  In 12 *Johns. R.* 300, and in 3 *Cowen*, 281, it is settled.  "A subsequent assent may be inferred from circumstances which the law considers equivalent to an express ratification."  In *Comyn's Dig. tit. Agreement, A.* 2.  An agreement executed often amounts to a bargain and sale.  So where an assent subsequent is given to an act precedent, by such assent the agreement is executed.  It is not then just to say this confirmation of Frith's shall relate to the life time of Mactier.  In *Comyn's Dig. tit. Bargain & Sale*, it is said, "If bargainor or bargainee die after the indenture executed, and before enrolment, the estate passes to the bargainee and his heirs, if it be enrolled within six months, yet the seisin continues in the bargainee.  So in *Cro. Jac.* 512, and *Viner, tit. Relation, F.* 6, *per Coke & Montague*, "execution of all things executory, respects the *original act*, and have relation thereto, and all make but one act, though done at several times.  So, where there are divers acts concurrent to make one estate, the original act shall be preferred, and to this the other acts shall come.  So, where two *times* are requisite to the perfection of an act, it shall be said upon their consummation to receive its perfection from the first.  *Dyer*, 244.  So, of two acts, as in *Bingham's case*, 2 *Co.* 93.  "Where to the perfection or consummation of a thing, two accidents are requisite, and the one

happens in the time of one, and the other in the time of the other, in such case, neither the one nor the other shall take benefit of this, because both are requisite to the consummation of the thing." How then does death make any difference? If it does, it is to be referred to the consummation, *to the first act, to the life time,* where, if neither party had died, it would not have been referred to such first act. *See Cro. Eliz.* 622.

The view which I have taken of this case, renders it wholly unnecessary for me to examine the point of stoppage *in transitu.*

Considering, then, that this agreement was consummated in the life time of Mactier, upon the principles and cases above adverted to, I have come to the conclusion that the administrators had a right to act, and would have been justifiable in taking, if they had not already done so, the brandy into their own possession, as a part of the assets of the deceased. It is laid down by *Winter's Office of Executor,* 82, " goods contracted for by testator, not delivered in his life time, must be delivered to his executors," and I can see no good reason why the same rule should not be extended to administrators.

The view, therefore, which I have taken of this case renders it unnecessary for me to discuss the other points made on the argument ; my opinion is, that the decree of the chancellor, so far as it relates to the sale of the brandy, should be reversed.

By Mr. Senator THROOP. Mactier and the respondent were equally interested as partners in the triple adventure, of which the brandy shipment was the commencement, but which extended to a second shipment of provisions to the amount of the invoice cost of the brandy from New-York by Mactier to the respondent at Jacmel, and a third shipment of coffee, with the proceeds, from thence to France in French vessels, to be there applied to the payment of the brandy. The order for the brandy was sent by the respondent to his friends in Havre, the 5th of September, 1822, expecting the arrival of the shipment "at New-York, in January or before." As early as October, however, he evinces a desire

to be released from the adventure, and offered his interest to the brother of Mactier, without success. This disposition appears to have continued, and is expressed in his letters on this subject.

The account current, and the correspondence show, that the respondent was largely in arrear to Mactier, and he frequently alludes to it, and excuses his inability or delay to make remittances. To have the value of the brandy shipment placed to his credit, or made to cover his transactions on account at New-York, seems to have been one prevailing object in offering to part with his interest. He also wished to bring his concerns to a certain focus, and to confine his business as much as possible ; and one other prevailing consideration was to be released from the two shipments originally planned, and consequent upon the brandy adventure. These considerations received additional weight and urgency from the prospect of a war between France and Spain, and the inevitable embarrassment of the trade of the island, thus likely to ensue, in which he was engaged. The joint adventure, in all the three operations, would in that event be subject to war risks, and even the brandy shipment became a hazardous and doubtful speculation. It was his desire to be released from all ; and the tenor of all his letters evinces the continual interest which he had in effecting such an object. But the brandy had been ordered, and could not be refused by the parties ; it was afloat, or would be so, before the order could be revoked, and the consequences of this part of the adventure were inevitable. Their interest was joint, the profits or losses were to be ascertained when the third and last shipment was closed, and then to be shared equally ; and neither could arrest the adventure, or be released from any part of it, except by the consent of the other.

It appears from the correspondence that these parties were on terms of intimate and confidential friendship and intercourse, and when the respondent, in his letter of the 24th December, 1822, proposed to Mactier, " to take the adventure solely on your own account, holding the value to cover the transactions to my account in New-York," the proposition was not probably new or unexpected to Mactier

His letter in reply seems intended, or is calculated to in-spire greater confidence of a good issue, and to quiet any doubts of a favorable result. His answer is dated the 17th January, 1823, saying that he is informed that the brandy would be shipped, and leave Bordeaux about the 1st De-cember. "This has been from the first a favorite speculation with me, and am pleased to say it still promises a favorable result; but to render it complete, I am desirous the specula-tion should go forward in the way first proposed, thereby making it a triple operation; as you have, however, ex-pressed a wish that I should take the adventure to my own account, I shall delay coming to any determination, till I again hear from you. The prospect of war between France and Spain may defeat the object of this speculation, as far as relates to shipment of the provisions hence to Hayti, to be in-vested in coffee for France, per French vessels; in which case I will at once decide to take the adventure to my own account." "The next arrival from Europe will probably de-cide the question of peace or war, and I will lose no time in communicating the same to you." "Let what will happen, I trust you will in no way be a sufferer." He communi-cates all his information of the prospect of war.

I consider this letter as declaring with sufficient certainty, to this effect, 'notwithstanding my information which I com-municate herein, our triple operation promises a favorable result, and I shall delay till I hear from you again, and then determine upon your offer, either to take or reject. But if the prospect of war shall cut up our two adventures consequent upon this, I will at once decide to take your offer, and will lose no time in communicating the same to you. In either case, I trust you will not be a sufferer.' I observe here, that from the tenor of this letter, and also of respondent's enclos-ing the order for the brandy, both parties expected its arri-val daily, and that the responden's offer and his answer were written under such expectation, and that in the respon-dent's letter of the 28th March the offer is renewed, when he supposed it had long since arrived.

That Mactier considered his reply to the offer an obliga-tion on his part to take, so soon as the prospect of war was

so far confirmed, as to render it proper to break up the two succeeding shipments, appears in two ways. The clerk of Mactier says, that when the brandy arrived, the war was uncertain. Mactier then concluded that the original voyage should be broken up, being unprofitable. He consulted Bane, and referred to this letter, and upon that consultation, it was concluded that " he was obliged to take the brandy, whether it came to a good or bad market." It appears, from Alexander Mactier's testimony, that the speculation was profitless to Mactier. The consultation with Champlin agrees throughout so well with the transaction and letter of the 17th January, and with no other, that it must have been at that time; for then, it would seem from his letter, "he was inclined to take the brandy."

But his letter of the 25th March, explains and confirms his idea that this letter of the 17th January was obligatory upon him, whether the market was good or bad. He then says, "I have to advise the arrival of the 200 pipes of brandy, and in consequence of the probability of the war between France and Spain, and in compliance with the wish expressed in your regarded favor of the 24th December, and my answer thereto of the 17th January, I have decided to take the adventure to my own account." In consequence he gave the respondent credit, according to his original proposition. Nothing more was wanting to prove and enforce this bargain against Mactier or his representatives, than these letters and acts. Notwithstanding the bargain was complete against Mactier, the fact of ownership, as expressed by Bane in his testimony, was contingent. The assent of the respondent was not then known; it had not been expressly given, and if the expected letter from the respondent, in reply to the one of the 17th January, had contained his dissent or a retraction of his original offer, the adventure would have been thrown back to its original state and interests.

Did the respondent ever assent to this contract, so as to vest the title of the brandy absolutely in Mactier, before his death? An assent to a contract may be inferred from circumstances, from voluntary inaction or forbearance to act. Thus, a man by his silence, if he has an opportunity of speak-

ing and knowledge of what is doing, is supposed to give his assent to what is done. On the 25th March, when the credit was given, a long time had elapsed since the 17th January, and no dissent to that letter, or retraction of the offer, had been received ; still the respondent's letter might have been sent, and the delay reasonably accounted for, if in fact he had dissented or retracted. And here I remark, that this circumstance sufficiently explains the contents of Mactier's letter of the 13th March, in which he informs the respondent that from the last dates received by him, war might be considered inevitable ; and says of the brandy : "I am looking daily for its arrival ; it is to be regretted the order was not more promptly executed, as the delay, I fear, will operate to our disadvantage." As promised in his letter of the 17th January, he communicates the first intelligence of peace or war, but having no letter from the respondent since his of that date, he does not retract what he had then said, nor does he treat the lapse of time as an assent or confirmation of it by the respondent. The language "our disadvantage" is used in reference to the then state of the correspondence, and expressed their joint interest, in case the respondent had in fact dissented or retracted his offer.

But I consider the assent of the respondent to this contract to rest upon surer ground than any circumstance of the unsatisfactory and doubtful character of mere lapse of time. His letter of the 7th March must, under all the circumstances, be considered a legal acquiescence and consent on his part. And while I would admit that proof of any attempt by "a swift messenger," or any other less rapid means, to withdraw it, or to dissent from the conditional acceptance of Mactier, or to retract his original offer, would have materially weakened or annulled its effect, it is manifest that no such attempt was made, and that all the circumstances show a contrary intention. When the respondent wrote the letter of the 7th March, Mactier's letter of the 17th January was before him ; and if he did not wish to have his original offer stand the chances mentioned by Mactier, he was bound to have improved the first opportunity to with-

ALBANY,
Dec. 1830.

Mactier
v.
Frith.

draw it. In 1 *Livermore on Agency*, 48, and the cases there cited, is found this rule : "If a man receives a letter, the relation of the parties favoring the presumption, he is presumed to approve whatever is contained in the letter, unless he immediately makes known his dissent. But the reception of a letter not contradicted, does not always amount to a ratification, unless it is accompanied with circumstances capable of showing an intention to ratify." Also, 2 *Johns. Cas.* 424. 12 *Johns. R.* 300. 3 *Cowen*, 281. This is the rule of reason and plain dealing, as well as of the law. If this letter contained no reference to the negotiation, his silence and forbearance to improve this opportunity to dissent should be held to bind him. He, however, says: "I have received your esteemed favors of the 17th and 21st January, and note their respective contents." Is there any thing wanting to bring the respondent within the familiar case and known rule, of a man who, knowing what is doing, and having an opportunity of speaking, by his silence is held to give his assent to what is done?

But if there could be any doubts of this case, coming fully within the rule cited from *Livermore*, the letter of the 7th March is followed by another from the respondent of the 28th, and still another of the 21st April, each capable of showing his intention to ratify his original offer, and confirming his assent to what had been done by Mactier. On the 28th March, after expressing his expectation that the brandy had arrived long ere that time, unless the rupture, we have a report of, between France and Spain took place before the sailing of the vessel, he says: "With regard to this adventure I wish to confirm, if entirely satisfactory to you, what I mentioned to you some time ago, and which I omitted to repeat in my previous letter in reply to yours of the 17th January." In his letter of the 21st April, he acknowledges the receipt of Mactier's "esteemed favor of the 25th, with that of the 5th inst. and notes particularly their respective contents, to which principally my previous respects (being his of the 28th March, and 12th current) reply ;" and he then ordered the shipment of a cargo to him. Hence it appears, that the presumed legal effect of the letter of 7th

March, is precisely the intended meaning of the respondent, and, (as he expresses himself) "I note the contents," it means, he approves and assents to them.

Under all the circumstances, I can entertain no doubt, that the letter of the 7th March, was intended, and should be considered as an express assent to the conditional acceptance and the reply of Mactier in his of the 17th January. He allowed his correspondent and confidential friend to proceed to close the bargain, as he had informed him he should do upon receipt of his letter then in writing, or upon the happening of the contingency then in prospect. His letters show of how little regard, in comparison to his anxiety to be released from the adventure, was the fact of the arrival of the brandy at New-York, or the price at which it would sell; his readiness to bear the joint risks of transportation, if such was the intention of Mactier, in delaying to release him before its arrival, and his willingness to wait the happening of the event referred to by Mactier, upon which he would determine to take it to his own account. Mactier died on the 10th April; but from the 21st April, (if not before,) until that event was known at Jacmel, he could not have doubted, nor (as his letters show) have regretted one moment his release from the triple adventure, nor the absolute sale of the brandy to Mactier. Shall he now be heard to complain that Mactier did not close the bargain till its safe arrival at New-York, and a sale of $\frac{3}{4}$ of the brandy? that he had run all the risks of the sea? Before he does so, he must show that on the 7th March, or some other early opportunity, or in some way, he refused to encounter such risks; or dissented from any release after the brandy should have arrived, or expressed, or attempted to express, his non-concurrence to the conditional acceptance and understanding of Mactier. Both parties expected its arrival before the day when he was writing; and from the contents of Mactier's letter of the 17th January he must have supposed it was then a long time in New-York; his letter was to encounter a further delay in its transmission, and when it should be received, Mactier would see in it the usual approbatory expression, "I note its contents." It would be

sanctioning a dangerous departure from good faith and plain dealing in a commercial correspondence, if any other construction or effect should be given to this letter of the 7th March. If this letter had been received by Mactier in his life time, and it is stated by the chancellor to have been so received on the 7th April, before which time he had taken the brandy to his own account, and given the respondent credit according to his original proposition, nothing would have been wanting, according to my view of the effect of these letters, to a perfect and consummated bargain on the 25th March.

The doctrine of stoppage *in transitu*, and the question whether the representations of this or any other vendee can ratify, consent to or affirm a contract *in fieri* at the time of the death, do not appear to me to form appropriate or necessary inquiries in this case. The case of *Conyers, &c.* v. *Ennis*, decided by Judge Story, 2 *Mason*, 236, found in 6 *Cowen*, 116, is strong upon both these enquiries, as they are raised in the present case. Here was a period of from the 25th or 28th March to the 10th April, when Mactier died, and long afterwards, during which, both parties assented to the bargain, upon terms well understood and acceptable to both; when such consent had been committed to writing and despatched to each other, and no effort at withdrawal or dissent attempted by either, until long after the arrival of the letter, and the actual sale of the whole, and the probable consumption of a considerable portion of the subject of the contract.

My opinion therefore is, that the letters of the 24th December and 17th January assented to, explained and confirmed by the subsequent letters, acquiescence and acts of the parties, fully establish a contract of sale, and that the decree of his honor the chancellor, in the points appealed from, should be reversed.

Whereupon, on the question being put, Shall the decree of the chancellor appealed from, be reversed? Chief Justice SAVAGE and Justices SUTHERLAND and MARCY, and eighteen senators voted in the affirmative; and three senators voted

ALBANY,　　in the negative, viz. Senators McCarty, Todd and Whee-
Dec. 1830.　ler.

The decree of the chancellor was acccordingly reversed with costs.*

---

A member of the court for the cosrection of errors, may, .by virtue of the *constitution* of the state, and notwithstanding the provisions of the *revised statutes*. decide or take part in the decision of a cause, determined by him when sitting as a *circuit judge*.

There were *three causes* brought up into this court by *writs of error*, on bills of exceptions signed by the chancellor previous to his promotion, in causes tried before him whilst one of the circuit judges of the state, which were argued during the autumn session of the court. Previous to the argument, the Chancellor stated the fact, and directed the attention of the court to a provision in the *revised statutes*, under the head of " General Provisions concerning the courts of Justice," &c. in these words : "No judge of any appellate court, or of any court to which a writ of *certiorari* or of error shall be returnable, shall decide, or take part in the decision of any cause or matter which shall have been determined by him, when sitting as a judge of any other court," 2 *R. S.* 275, § 3, and desired an expression of opinion from the members of the court upon what he deemed a conflict between the provisions of the constitution organizing this court, and designating its constituent members, and the enactments of the legislature. No order was then taken on the subject ; the chancellor heard two of the causes argued, (the third was argued whilst he was necessarily sitting in his own court,) and now after the decrees in cases on appeal had been decided, and

---

* In settling the decree in this case a question arose whether costs should be allowed to the appellant. Mr. Justice *Marcy*, who delivered the leading opinion in the case, was against allowing costs, Chief Justice *Savage* and Mr. Senator *Maynard* concurred with him. Mr. Justice *Sutherland* and Mr. Senator *Benton* were of opinion that there was nothing in the circumstances of the case entitling the respondent to an exemption from the payment of costs. On the question of costs the members of the court stood, 14 to 12.