Trevor agt. Wood.

WILLIAM HENRY ARNOUX, *in opposition, cited Laws* 1840, *p.* 327; *Laws* 1844, *p.* 402; *Laws* 1854, *p.* 592.

———◆◆———

# SUPREME COURT.

JOHN B. TREVOR, JR., and JAMES B. COLGATE agt. JOHN WOOD and others.

Where parties residing in different states, engaged together in business transactions, agree that their communications to each other shall be made by *telegraph*, it is, in effect, a *warranty* by each party that his communication to the other *shall be received.*

A communication is only *initiated* when it is *delivered* to the telegraph operator; it is *completed* when it comes to the *possession* of the party for whom it is designed.

The rule that has been established by the courts in respect to *contracts* made by letter sent through the *mail*, is not applicable to communications by telegraph.

*New York General Term, February,* 1864.

*Present,* SUTHERLAND, LEONARD and CLERKE, *Justices.*

THIS was an appeal from a judgment entered on the report of a referee. The facts are as follows:

The plaintiffs and defendants were respectively partners, as stated in the complaint, and were respectively dealers in specie, exchange and bullion. The plaintiffs doing business in the city of New York, the defendants in the city of New Orleans.

On the 30th of January, 1860, the plaintiffs telegraphed to the defendants as follows:

" To JOHN WOOD & Co.

" At what price will you sell one hundred thousand Mexican dollars, per next steamer, deliverable here?

" TREVOR & COLGATE."

On the 31st of the same month the defendants answered the above by another telegram as follows:

" TREVOR & COLGATE, NEW YORK:

" Will deliver fifty thousand at seven and one quarter, per Moses Taylor. Answer. JOHN WOOD & Co."

The word " answer " was on the last dispatch as written by the operator at New Orleans, but was not on the copy delivered to the plaintiffs.

On the same day (January 31st, 1860), the plaintiffs telegraphed to the defendants as follows:

" To JOHN WOOD & Co.

" Your offer fifty thousand Mexicans, at seven and one quarter, accepted. Send more if you can.

" TREVOR & COLGATE."

On February 1st, 1860, (the next day), the plaintiffs again telegraphed to defendants as follows:

" To JOHN WOOD & Co.

" Accepted by telegraph yesterday your offer for fifty thousand Mexicans. Send as many more at same price. Reply. TREVOR & COLGATE."

The last above named telegram, as well as that of 31st

January from the plaintiffs, did not reach the defendants until 10 A. M., on the 4th February, 1860, in consequence of some derangement in a part of the line used by the plaintiffs, above Canton, Mississippi, from noon of January 31st to the morning of February 4th, but which was not known to the plaintiffs until 4th February, when the telegraph company reported the line down.

On the 3d day of February, 1860, the defendants telegraphed to the plaintiffs as follows:

" Messrs. TREVOR & COLGATE, New York.

" No answer to our dispatch 31st. Dollars are sold.

" JOHN WOOD & Co."

Which telegraph the plaintiffs received on the same day and answered it as follows by telegraph on the same day :

" To JOHN WOOD & Co.

" Your offer was accepted on receipt and again the next day. The dollars must come or we will hold you responsible. Reply.       TREVOR & COLGATE."

On the 4th February, 1860, the plaintiffs telegraphed to the defendants as follows:

" To JOHN WOOD & Co.

" Telegraph company reports line down on the 31st, hence the failure of our two messages. We sold the dollars and must have them by this or the next steamer or we are liable for damages. Don't fail to send the dollars at any price. Will write to-day.

" TREVOR & COLGATE."

On the same day the defendants telegraphed the plaintiffs as follows :

" To TREVOR & COLGATE.

" No dollars to be had. We may ship by steamer 12th, as you propose, if we have them.

" JOHN WOOD & Co."

The steamer Moses Taylor was, in fact, to sail from New Orleans on the 5th February, 1860, and did sail on that

day at noon, and arrived at New York on the 13th day of said February.

It is usual not to ship specie until the day before the sailing of the vessel.

All the telegrams were punctually transmitted and received on the same day that they were written, except the telegrams of acceptance deposited by the plaintiffs in the office at New York, on the 31st January and 1st February, respectively.

The plaintiffs, by paying an extra price, could have had their telegrams to New Orleans repeated from there so as to be certain that they had been properly transmitted. This they did not do.

It is not usual to have telegrams repeated.

The market price of Mexican dollars, on the 13th February, 1860, was 7 5-8 above par.

In July or August, 1859, an arrangement was made at an interview between the plaintiffs and defendants, that if the defendants had dollars to sell they should telegraph to the plaintiffs, who should answer whether they would take them or not, and that everything between them should be done through the telegraph.

All the plaintiffs' telegrams were sent by the "Interior, or National line," and all the defendants' telegrams by the "Seaboard Telegraph line." These two companies had but one office in New York. The lines of the company employed by the defendants were in running order during all the period in question. The lines of the company employed by the plaintiffs were down on 31st January, in the afternoon, and thence until the 4th of February.

The telegrams of acceptance by the plaintiffs, on the 31st January and 1st February, were not prepaid by the plaintiffs, but were paid by the defendants at New Orleans where the messages were received by them on the 4th of February. The defendants prepaid all their own telegrams.

The telegraph company employed by the·plaintiffs knew that the line was down on the 31st of January, and communicated that fact to the office in New York on the afternoon of that day, or early the next morning, but did not notify the plaintiffs of the fact until the 4th February. That the plaintiffs might have ascertained it by inquiring at the office in New York, on the 1st February, which they did not do.

Both parties acted in good faith. That the defendants waited a time that would have been reasonable under the circumstances and would have been justified in regarding their offer as not accepted, were it not for the rule of law stated by the referee in this case.

The damages sustained by the plaintiffs by the omission of the defendants to forward the dollars was $187.50, with interest from February 13, 1860, amounting on the day of the date of said report to $219.53 in all.

Upon the foregoing facts the referee found as conclusions of law as follows, viz :

1st. That the contract between the plaintiffs and the defendants was completed on the same day that the plaintiffs' acceptance of the defendants' offer began to be transmitted by said telegraph company to the defendants, viz: on the 31st day of January, 1860, or as soon thereafter as the telegram could be transmitted by due diligence, which would be on that or the following day, and then the defendants were bound to fill the contract.

To which conclusion of law the defendants duly excepted.

2d. That it was not necessary that the defendants should actually receive the message of acceptance before the contract was binding and effective.

To which conclusion of law the defendants duly excepted.

3d. That the non-payment of their telegrams of acceptance of the 31st January and 1st February did not pre-

vent or destroy the effect of their deposit in the office in New York and the commencement of their transmission, in completing said contract and binding the defendants to its performance.

To which conclusion of law the defendants duly excepted.

4th. That the defendants were not justified in attempting to withdraw their offer, or in selling the dollars when they did.

To which conclusion of law the defendants duly excepted.

5th. That it was the duty of the telegraph company employed by the plaintiffs on the 31st day of January, 1860, or promptly thereafter, to have notified the office in New York of the break in the line at Canton, and then for the office in New York to have promptly notified the plaintiffs of the same facts; and that it was negligence in the company to delay giving this notice until the 4th day of February.

6th. That the plaintiffs are not responsible for the negligence of said company.

To which conclusion of law the defendants duly excepted.

7th. That as between the plaintiffs and defendants in this action, the plaintiffs were not guilty of negligence in not inquiring at the office in New York before the 3d February, and on ascertaining that the interior line was down, sending the telegram by the other line.

To which conclusion of law the defendants duly excepted.

8th. That the plaintiffs were not guilty of negligence in not having their telegrams and acceptance repeated.

To which conclusion of law the defendants duly excepted.

9th. That the telegram of the defendants of February

3d, notifying the plaintiffs that the dollars were sold, did not operate as a withdrawal of said offer.

To which conclusion of law the defendants duly excepted.

10th. That there was a sufficient contract, notwithstanding the statute of frauds.

To which conclusion of law the defendants duly excepted.

11th. That upon the facts in this case the defendants were bound to fulfill the contract, and to pay the plaintiffs their damages for the non-fulfillment of the same.

To which conclusion of law the defendants duly excepted.

12th, That the plaintiffs are entitled to judgment for such damages, amounting to $219.33, and to their costs to be adjusted.

To which conclusion of law the defendants duly excepted.

IRA D. WARREN, *counsel for appellants.*

I. The referee erred in finding as a fact, " that it is not usual to have telegrams repeated." All the evidence upon that subject is the other way.

II. The referee erred in finding, as a conclusion of law, that the contract was completed on the same day that the plaintiffs' acceptance of defendants' offer began to be transmitted to the defendants, and that it was not necessary that the defendants should actually receive the message of acceptance to make a binding contract.

1. The plaintiffs, then, must rely wholly upon the assumption that communications by telegraph, between contracting or negotiating parties, are governed by the rule laid down in the cases of *Maetier* agt. *Frith,* and *Vassar* agt. *Camp,* in reference to negotiations by mail.

It is submitted that, as the question is new, this court

will not establish such a rule in relation to communications by telegraph, unless it be supported by clear analogy, or by conclusive reasons founded upon justice and public policy, and that it is supported by neither.

2. When the rule in reference to mail communications was first established in this state, it required every argument in its favor to support it.

And it is submitted that it must soon be modified here in cases where the parties have also telegraphic facilities, or business men will cease to use the mail for business purposes.

3. There is no more reason why this rule should be applied to a telegraphic message than to a message sent by a private messenger, or by an express company. In case of mail, the medium of communication is not responsible to, or under the control of either party, and is the agent of neither. In the language of SELDEN, J., in *Vassar* agt. *Camp*, " He (the person depositing in the post-office) can do nothing more to insure the safe delivery, and is not responsible for its miscarriage." The telegraph is controlled and managed by private persons or corporations. Its owners receive compensation, and are liable for errors and failures in the same way as individuals.

4. In this case there were two distinct lines. The plaintiffs had a choice of messengers. There is no such choice in case of mail.

5. The person depositing a letter in the post-office cannot know that it will be received in due course of mail, and he necessarily acts upon the faith that it *will*. Not so with the telegram. By repeating he can be assured of its delivery, or ascertain its failure.

6. The referee has found that the damage was occasioned by the negligence of the national telegraph company, employed by the plaintiffs. Whether agent of the plaintiffs or not, it is responsible to them for damages occasioned by its negligence in their employment. (*Sedg.*

*on Damages*, 62, 63 ; *Bryant* agt. *American Telegraph Company*, *Transcript*, *March* 14, 1862 ; *N. Y. &c. Tel. Co.* agt. *Dogbury*, 35 *Penn. State R.* 298 ; *W. & C. Tel. Co.* agt. *Hobson*, 15 *Gratt. Va.* 122 ; *Parks, &c.* agt. *Alton, &c. Tel. Co.* 13 *Cal.* 422 ; *Camp* agt. *Western Telegraph Co.* 1 *Met. Ky.* 164.)

It is not responsible to the defendants, as there was no contract between them. The rule, contended for by the plaintiffs would charge an innocent party, who has no remedy, with damages to—if you please—an equally innocent party, but who has complete remedy against the one properly chargeable. No legal proposition can be established which ever produces such absurd consequences. The rule is well established that whenever one of two innocent parties must suffer by the act of a third, he who has enabled the third party to do, or occasion the injury, must sustain the loss. (*Downs* agt. *Greene*, 24 *N. Y.* 645.)

The ruling of the general term, in reversing the former judgment, may, perhaps, be reconciled with the common sense of the case, by leaving the parties to the law governing contracts in ordinary cases, viz : that the acceptance must be communicated within a reasonable time, to the party to be charged, or his authorized agent. Each retaining any remedy they may have against third parties in case of accident or neglect.

(*a*). The rule, in the case of the mail, is founded upon other considerations than the mere fact that the post-office department is not held to be the agent of either party; in fact the absence of the relation of principal and agent, between the party depositing the acceptance, and the mail which carries it, seems scarcely to have entered into the reasoning of the cases, and the considerations which controlled the court in adopting that rule do not apply to telegraphic communications as shown above.

(*b*). A party is chargeable with all the information he might have obtained by reasonable diligence. He knew, or

---

---

should have known, that this telegraph was down and that another line was running.

Suppose a party knew that, by reason of an insurrection, the mails were entirely stopped, would a deposit in the post-office of an acceptance bind the other? Clearly not, but were there a telegraph line working, which he might use, the case would be stronger. Then, should the offerer withdraw his offer before the mails started, would any reason remain for holding a contract completed?

7. Suppose the defendants had not received the telegram of acceptance until February 5th, and had sold their dollars when the steamer sailed, or had the plaintiffs deposited their telegram when they knew both lines were down, would defendants have been liable? If not, then there is no such rule, and the only question is, whether the defendants waited a reasonable time. The referee has found that they did.

8. The plaintiffs might have withdrawn their message of acceptance on the 2d, before it was actually transmitted, and they would not have been bound by it.

Had it been a letter sent by mail, they could not have done it. If the contract is not binding on one party, it should not be on the other.

III. The defendants waited more than a reasonable time. The message contained the word " answer," which meant answer at once, and they waited four days for what should have reached them in one day at furthest. (*Story on Contracts*, §§ 380, 344, *and* 388.)

(*a*). " The plaintiffs had a right to withdraw their offer, and did so on the 3d February, and before the acceptance reached them." (*Payne* agt. *Cave*, 3 *Term R.* 148; *Parsons on Contract*, *vol.* 1, *p.* 399 *to* 408, *and cases cited*; 3 *Cushing*, 234.)

The referee erred in finding that the telegram of February 3d did not amount to a withdrawal.

IV. The plaintiffs were guilty of negligence. They knew

that by repeating their telegram they could ascertain whether it went through or not, and if not, could send it by the other line ; or, if both failed, by knowing it they would avoid entering into engagements resulting in damage. They cannot recover of the defendants damages, which their own negligence, in any way, contributed to produce, or which were caused by the negligence of the medium of communication they employed to transmit their message. There was no arrangement between the parties to employ this particular company. There were two companies.

V. There was a condition attached to the offer. The word "answer," on defendants' telegram, was equivalent to saying, "we must receive an answer at once, to make this binding." The plaintiffs' theory, and the only one upon which this case can stand, that the company being the agent of no one, and not responsible for its acts, its acts or omissions do not affect the rights of the parties. The non-reception of this word by plaintiffs does not alter its effect. The condition was not complied with and no contract was made.

VI. The plaintiffs did not prepay the telegraph company's charge upon their messages of acceptance. The defendants might properly have refused to receive a communication so encumbered, and such a message cannot be considered as delivered for the purpose of binding a party who could only know its contents by paying a charge which the plaintiffs themselves should have paid.

VII. The real responsibility is with the national telegraph company, where the referee places it. The fault was theirs, and they are liable to damages to the plaintiffs who employed them. If the plaintiffs should recover of the defendants, the latter would be remediless, as there was no privity of contract between them and that company.

VIII. Communications by telegraph are not such memo-

randa in writing as to take the case out of the statute of
frauds.

1. There is no evidence that the defendants left a copy
of the dispatch of 31st January at the office in New Or-
leans, signed by them, or that such a writing, so signed,
was delivered to the plaintiffs.

2. If it be answered that the defendants made the tele-
graph company their agent to sign and deliver such a
memorandum in writing, the fact of the agency overturns
the only theory upon which the plaintiffs' case can stand.

IX. The judgment should be reversed.


GEORGE R. THOMPSON, *counsel for respondents.*


I. There was a valid contract made between the parties.

(*a*). The offer of Wood & Co. was distinctly to deliver
to plaintiffs, by the steamer Moses Taylor, which was un-
derstood to sail, and did sail from New Orleans to New
York on the 5th of February, 1860, certain dollars, at a
certain price. This was an offer continuing and binding
upon the defendants up to the time the steamer sailed,
unless withdrawn previous to its acceptance, and they
were bound to hold the dollars at the disposal of the
plaintiffs until that time, whether the offer was accepted
or not. The proposer may, and has, in this case, deter-
mined how long the offer shall continue. "If the pro-
poser receives the assent to it before retracting his offer,
he is bound by it." (*Parsons on Contracts*, 405, *vol.* 1;
*Boston and Maine R. R.* agt. *Bartlett*, 3 *Cush.* 224; *see Cases
cited in notes to Parsons on Contracts, vol.* 1, *book* 2, *ch.*
2, *pp.* 404–8.)

(*b*). If it be considered that defendants were only bound
to wait a reasonable time before disposing of the dollars
offered, then that reasonable time is, in this case, to be de-
termined by the sailing of the steamer, if she sailed at the
460

time the defendants supposed she was to sail, when they forwarded the offer.

If the proposer fixes a time, he expresses his intention, and the other party knows exactly what it is. If no definite time is stated, then the inquiry is as to what time it is natural to suppose the parties contemplated. The intention is to be gathered from the offer itself, and from the attendant circumstances. There can be no doubt from the offer itself, but that the defendants meant to make the offer continuing until the sailing of the steamer. The steamer was to sail in a few days; the defendants knew it; they offered to send the dollars then if desired, and they were bound to wait until that time before they put it out of their power so to do.

The offer did not relate to any particular dollars then in their possession. It does not appear whether they had these dollars on hand, or proposed to procure them elsewhere. It would have been no answer to this action that Wood & Co. expected to be able to procure the dollars, and afterwards found themselves unable to do so. Is it not reasonable to suppose that the plaintiffs thought that they could accept the dollars at any time previous to the sailing of the steamer? The offer is susceptible of no other construction. Three, or four or five days was not an unreasonable time to wait, in any event. The defendants themselves did not exercise due diligence.

(c). The offer was accepted by telegraph the same day it was made, again the next day, and also by letter, properly mailed, the same day. All these different acceptances reached the defendants the day before the sailing of the steamer.

II. Either of these acceptances concluded the contract the moment either were put in a proper way of being communicated to defendants.

And the referee under the decision of this court at gen-

eral term made no error, in disregarding the question of negligence.

(a). The question is, was there a contract ? The definition of a contract is the agreement or meeting of minds' for the consummation of any particular object. It has been decided by the court of last resort in this state, in broad terms, that if a proposer makes his offer by mail, and that offer is accepted, before notice of its withdrawal, by depositing an acceptance in the post-office properly addressed to the proposer, that at that moment the contract is complete, and it makes no kind of difference whether the proposer ever receives the acceptance, or ever hears of it, or not. (*Vassar* agt. *Camp*, 1 *Kern.* 441 ; *Mactier* agt. *Frith*, 6 *Wend.* 103 ; *Adams* agt. *Lindsell*, 1 *Barn. & Ald.* 681.)

In the case in *Wendell*, the court say : " Where the offer is by letter, the usual mode of acceptance is by sending a letter announcing a consent to accept; where it is made by a messenger, a determination to accept, returned through him or sent by another, would seem to be all the law requires. There are other modes equally conclusive upon the parties ; keeping silence under certain circumstances is an assent to a proposition ; anything that shall amount to a manifestation of a formed determination to accept, communicated or put in a proper way to be communicated, to the party making the offer, would doubtless complete the contract. The knowledge of the party making the offer of the determination of the party receiving it, is no ingredient of an acceptance."

III. If this is law, then we insist there is a contract in this case.

(a). The only question is as to whether there is any difference between the telegraph and the mail, or whether the privilege does not equally apply to the telegraph as to the mail.

The reason why the contract is considered binding in

the case of the mail is, that the minds of the parties having met, the contract is rendered complete at once. The non-liability of the government for the neglect of the officials at the post-office is not the reason. Post-office officials are not liable for neglect, and the difficulty of tracing the neglect to its source, or the lack of responsibility of any postmaster is not a reason for the doctrine as established. (*Whitfield* agt. *Lord de Spencer, Cowper,* 754, 765; *Teal* agt. *Felton,* 1 *Comstock,* 536.)

There is then no real difference between the mail and the telegraph in this respect. And the decisions do not put the case of the mail upon any such ground. The ground is the absolute completion of the contract; not that as you cannot sue the post-office, therefore you may sue the party.

IV. If the offer was not accepted by telegraph, it was by mail.

V. If these views are correct, then certainly the question of the negligence of the telegraph company had nothing whatever to do with the case, and the referee did not err in deciding that the plaintiffs are not responsible for the neglect of the telegraph company.

(*a*). There was no neglect on the part of the plaintiffs; their failure to repeat their messages is of no consequence. It is not usual to do so, nor was it incumbent upon them.

VI. The testimony on the question of negligence was inadmissible for another reason. In order to show it, it was necessary that the answer should allege it. It contains nothing of that sort. (*McKyring* agt. *Bull,* 16 *N. Y.,* 297.)

VII. On the hearing of the former appeal in this case the court decided that the telegraph company was not the agent of the plaintiffs, and that therefore they are not responsible for its negligence.

This decision is evidently correct, especially in view of the fact that there was an arrangement between the parties

to correspond by telegraph in relation to business, and this contract was made in pursuance of that arrangement.

And the subsequent ruling of the referee granting the judgment appealed from by this appeal was a matter of course.

VIII. It is evident that this contract was not void under the statute of frauds.

(*a*). It is proved beyond question that the defendants sent an offer. This they subscribed before they sent it and do not deny it. It was not necessary to produce the original telegram. The contract was confirmed by a letter which was produced and which was' signed by defendants.

IX. The judgment should be affirmed.

By the court, LEONARD, J. There was never any *aggregatio mentium*, or meeting of the minds of the parties in respect to the purchase and sale of the dollars in question.

The plaintiffs failed to notify the defendants of the acceptance of their offer until after the defendants had countermanded or recalled it.

The plaintiffs must be regarded as having undertaken on their part to bring to the defendants the knowledge of their acceptance or refusal of the offer made. The parties had agreed beforehand that their communications should be made by telegraph.

This was in effect a warranty by each party that his communication to the other should be received.

It cannot be supposed that the party who was to receive the communication was willing to incur the hazard of a safe delivery of the messages of the other party with whom he was in treaty through the medium of the telegraph. The communication is only initiated when it is delivered to the telegraph operator. It is completed when

it comes to the possession of the party for whom it is designed.

We think that the rule that has been established by the courts in respect to contracts made by letter sent through the mail is not applicable to communications by telegraph. (*Mactier* agt. *Frith,* 6 *Wend.* 103; *Vassar* agt. *Camp,* 1 *Kernan,* 446.)

The public post-office is governed by no private interests. The officers who direct its operation are regulated by law, and its violation is punishable criminally.

The operators of the telegraph are appointed or employed by private enterprise, and are responsible to those who employ them for the proper performance of their service.

There are also other distinctions. The telegraph companies have been conducted, so far as has come to my knowledge, with great fidelity and integrity, but an institution of that kind cannot, while conducted by private enterprise, be so clothed with a public official character as to make the receipt of a communication at the office of the telegraph company of the same effect in relation to the acceptance of an offer by a contractitg party as the actual delivery of it would have.

The judgment should be reversed and a new trial had before the same referee. The costs of the appeal to the appellant to abide the event.